Hipolito **RODRIGUEZ RODRIGUEZ**,
Plaintiff, Appellee,

v.

Nicholas **MUNOZ MUNOZ**, Executive Director of A.D.T., Defendant, Appellant.

No. 85–1215.

United States Court of Appeals,
First Circuit.

Argued Feb. 4, 1986.

Decided Dec. 18, 1986.

Jose Angel Rey, Santurce, P.R., with whom Pedro Juan Perez-Nieves, Hector Rivera Cruz, Secretary of Justice, and Rafael Ortiz Carrion, Atty. Gen., San Juan, P.R., were on brief for defendant, appellant.

Jesus Hernandez Sanchez, San Juan, P.R., for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BREYER and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiff-appellee Hipolito Rodriguez Rodriguez brought an action under 42 U.S.C. § 1983 in the district court for the District of Puerto Rico claiming that his first amendment rights were violated when he was dismissed from the position of Regional Director in a Commonwealth of Puerto Rico agency because, allegedly, he planned to run for political office. Defendant in the action was Nicholas Munoz Munoz, the supervisor who had discharged him. The district court rejected Munoz's qualified immunity defense, ruling that the law against discharge of a public employee for political reasons had been clearly established. The court then sent the case to a jury, instructing it to find for plaintiff if he had been "dismissed solely for his political activities." The jury found for Rodriguez, awarding him a total of $100,000 in damages, and the court ordered that he be reinstated in his job. *Rodriguez Rodriguez v. Munoz Munoz*, 603 F.Supp. 349 (D.P.R. 1985).

On appeal, defendant Munoz advances new and different arguments in contending that we should overturn the judgment of the district court. When the case was argued below, the parties—and the district court—assumed that even though the discharged plaintiff belonged to the same party as his supervisor, and was not fired for

any doctrinal difference, it was a patronage dismissal case governed by the standards articulated in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In *Branti*, the Supreme Court held that a public employee could not be dismissed solely because of his party affiliation, unless the employer could demonstrate that "party affiliation [was] an appropriate requirement for the effective performance of the public office involved." [1] 445 U.S. at 518, 100 S.Ct. at 1295. On appeal Munoz points out for the first time that this case involves a discharge not because of plaintiff's political *affiliation*, as did *Elrod* and *Branti*, but rather because of his political *activity*. This case, Munoz insists, is closer to *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), where, in analyzing firings resulting from a public employee's outspoken remarks, the Supreme Court employed a balancing test, balancing the employee's right to speak up on matters of legitimate public concern against the government's need for efficiency in the workplace. Munoz asserts that the district court here should not simply have assumed that if plaintiff was fired because of his political plans, the discharge violated his first amendment rights. Rather the court should have balanced the relative importance of plaintiff's political activities against the government's legitimate needs.

Defendant further contends—also for the first time on appeal—that even assuming *Elrod-Branti* controls, plaintiff's job is one where political affiliation would be an appropriate requirement for the position of Regional Director. Thus, he argues, the district court erred in not finding the discharge a constitutionally permissible one under *Elrod-Branti*.[2] At the very least, he

---

**1.** For simplicity, we will at times refer to a "political" position as shorthand for the *Branti* exception permitting politically-motivated discharges of employees occupying positions where party affiliation is an appropriate requirement for effective job performance.

**2.** Since this case was argued, this circuit has issued two en banc decisions discussing the standards by which to determine whether or not a position is one for which political affiliation is an appropriate requirement. *See Jimenez Fuentes v. Torres Gaztambide*, 803 F.2d 1 (1st

says, the district court erred in rejecting defendant's qualified immunity claim, since it was by no means clearly established at the time he discharged plaintiff that plaintiff's position was of a type protected under *Elrod* and *Branti*. *See De Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir. 1986) (law very murky as to what higher level positions were protected against political discharges and what were not. *Id.* at 1194–95 (Campbell, C.J., concurring)).

 The above arguments are powerful ones. Normally, however, we would be precluded from reaching them by Munoz's failure to raise them below. It is a fundamental principle that, except in rare cases where paramount considerations of justice require, we do not review on appeal issues that were not first presented to the district court. *See United States v. Ven-Fuel*, 758 F.2d 741, 760 (1st Cir.1985); *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622, 629 (1st Cir.), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1983). Upon consideration, we believe this to be one of the rare cases justifying departure from the above principle. The confusion below was brought about in large part by the absence of clarity, and indeed outright confusion, in the relevant law. We believe we would compound the confusion were we, at a time when the Circuit is confronted with a number of political discharge cases, to affirm an incorrect analysis and result because of defendant's failure to have made the appropriate arguments below. We realize that a reversal on grounds not raised may be seen as "sandbagging" the trial judge, who of course was not responsible for coming forward with legal arguments not raised by the parties. We emphasize that nothing herein is to be taken as criticism of the judge. Still, we think that justice is better served in this unusual case by applying what we believe to be a correct analysis rather than by letting stand a wrong and potentially misleading precedent.

## I.

Defendant Munoz Munoz is a member of the New Progressive Party ("Partido Nuevo Progresista," or "PNP") and, at the time of Rodriguez's discharge, was the Executive Director of the Right to Work Administration ("Administracion del Derecho al Trabajo," hereinafter, the "Agency"). In March 1981, Munoz appointed plaintiff Rodriguez (also a member of PNP) Regional Director for the Humacao Region, one of nine Regional Directors for the Agency. According to testimony at trial, plaintiff was responsible for implementing at the regional level the Agency's "mission," that is, to provide job training and find employment for the economically underprivileged, according to the region's needs. Plaintiff, as Regional Director, reported directly to defendant Munoz. The position of Regional Director is classified as one of "trust" ("de confianza") under Puerto Rico personnel law, the only position to be so classified at the regional level. In contrast to a "career" employee, an employee of "trust" may, under Puerto Rico law, be discharged at will and without cause. P.R.Laws Ann. tit. 3, § 1350 (1984).[3]

Sometime in 1982, Rodriguez formed a "steering committee" with several friends and family members, and allegedly began meeting at a neighborhood bar, during nonworking hours, to plan his candidacy for mayor of Las Piedras (a town in the Humacao Region). Plaintiff alleges that defendant Munoz, who supported the incumbent mayor (also of the PNP), knew about his political ambitions, and sought to pressure him to abandon his plans to run in the PNP primary. When Rodriguez refused to do so, Munoz allegedly fired him during a meeting on March 18, 1983. Munoz coun-

Cir.1986); *DeChoudens v. Government Development Bank*, 801 F.2d 5 (1st Cir.1986).

**3.** We stated in our recent en banc decision interpreting *Elrod* and *Branti* that while, of course, the government's classification is not controlling for purposes of deciding whether a position constitutionally permits discharge for political reasons, it is one factor which may be considered along with a number of others. *Jimenez Fuentes v. Torres Gaztambide*, 803 F.2d at 10–11 (en banc).

tered that Rodriguez resigned when Munoz sought to transfer him to a different position because of his unsatisfactory performance as Regional Director. In particular, Munoz presented testimony at trial about certain "communications problems" caused by plaintiff at the Humacao regional office, and about plaintiff's alleged use of his position to advance his political career by favoring those who supported him.

Plaintiff commenced a section 1983 action against Munoz in May 1983, seeking back pay, compensation for pain and suffering, punitive damages, and reinstatement. The gravamen of his complaint is that he has a right under the first amendment to engage in political activities (in particular, to run for political office), and that Munoz abridged that right by firing him. After two unsuccessful motions for summary judgment as well as a motion for directed verdict by defendant on grounds, *inter alia,* of qualified immunity, the case was tried to a jury. The jury found for plaintiff, and awarded him $60,000 in compensatory damages and $40,000 in punitive damages. The district court permitted the substitution of Munoz's successor to the position of Executive Director of the Agency (who was of the rival Popular Democratic Party, or "Partido Popular Democratico" ("PPD")) for the purposes of injunctive relief, and ordered Rodriguez reinstated to his former position. Defendant now appeals.

## II.

On appeal, Munoz raises a number of issues, only some of which we need address. Since we are vacating the district court's judgment, and remanding for a bench trial, defendant's challenges to various jury instructions from the first proceeding as erroneous are moot. We turn first to defendant's argument that the district court erred in rejecting his qualified immunity defense, since, if correct, it would be dispositive of plaintiff's claim for money damages, leaving only a claim for injunctive relief.

### A. *Qualified Immunity*

On August 29, 1983, and again on December 3, 1984, defendant sought summary judgment on grounds, *inter alia,* of qualified immunity. Under the now familiar test for qualified immunity, defendant is shielded from liability for damages so long as his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3018, 3020 n. 12, 82 L.Ed.2d 139 (1984) (applying standard to section 1983 action). The district court twice denied the motion, noting that the relevant law was "clearly established" against Munoz's conduct. Defendant later renewed his qualified immunity argument in the form of a motion for directed verdict. This too was denied. Defendant now contends that the court erred in denying him qualified immunity.

In ruling that it was "clearly established" that an employee in Rodriguez's position could not be fired solely for political reasons, the lower court relied on three decisions from the Supreme Court of Puerto Rico—*Colon v. CRUV,* 84 J.T.S. 52 (1984); *Clemente Gonzalez v. Departamento de la Vivienda,* 83 J.T.S. 101 (1983); and *Ramos Villanueva v. Secretario de Comercio,* 112 D.P.R. 514 (1982). In these cases, the Supreme Court of Puerto Rico held that an employee of "trust" under Puerto Rico law could not be discharged for political reasons unless his party affiliation was a legitimate requirement for his job, and indicated that a supervisor carried a heavy burden to establish that political affiliation was a legitimate qualification for any job, even one of an executive policy-making nature. The facts in *Clemente Gonzalez* were similar to those here (a regional director of an agency was fired because he insisted on running for mayor against a candidate supported by plaintiff's supervisor). The court held there that both the Puerto Rico and the federal Constitution protected a "trust" employee from dis-

missal arising out of an *intra*-party political dispute.

While these decisions should be considered for their persuasive effect, they are not conclusive as to the state of the law when Rodriguez was fired. As pointed out in our recent en banc determination, they go further than do most circuit and district court interpretations of *Elrod-Branti* in refusing to allow political firings at the higher levels of government. *Jimenez Fuentes v. Torres Gaztambide*, 803 F.2d at 7 n. 9 (en banc).

Moreover, as neither *Colon* nor *Clemente Gonzalez* had been decided by the time of plaintiff's dismissal in March 1983, they are irrelevant in determining whether defendant was objectively reasonable in thinking, *at the time of the discharge*, he could lawfully discharge Rodriguez. *Ramos*, to be sure, had been decided by then, but, standing alone, was a far less clear signal as to the Puerto Rico Court's probable view of the present situation.

The question is whether defendant should have reasonably known when he discharged Rodriguez that the *federal* law was clearly established against his action. *See Alfaro de Quevedo v. De Jesus Schuck*, 556 F.2d 591, 592 n. 3 (1st Cir. 1977). As this section 1983 action is based on the claim that federal constitutional law was violated, the lower court erred to the extent that it may have relied on the protections of the Puerto Rico constitution and of the Puerto Rico courts in deciding whether or not it was clearly established, at the time of the firing, that plaintiff's position was one where political affiliation was an appropriate requirement.

This is not to blame the lower court for the error. Defendant entirely failed in his duty to assist the district court in making the proper qualified immunity inquiry. Not only did Munoz unquestioningly accept the applicability of the *Branti* doctrine even though, arguably, this is not a parallel case (*i.e.*, political affiliation is not in issue), he curiously made no argument that it was not clearly established in March 1983 that a Regional Director of the Agency was a "nonpolitical" position protected under *Branti*—or that plaintiff's position had such duties that politics *was* an appropriate consideration for the hiring authority to take into account. Even when the trial judge, noting that "under the facts I am not going to accept that this is an area of uncertainty [in] the law," pressed defendant's counsel for any decisions indicating that this case involved a "dubious grey area[ ] of civil rights," he conceded that Munoz's actions, if proven, were clearly unconstitutional.

The fact is, as we have indicated in a previous case, at the time Rodriguez was fired the law was uncertain as to whether a regional director, such as he was, could be discharged because of his political affiliation. *De Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.1986). The issue is further clouded by the fact that he was fired, allegedly, not for political affiliation as such but because of his ambition to run for mayor. As discussed *infra*, this may well involve a different type of analysis than straight *Elrod-Branti*. It was not at all clear in March 1983—indeed there is even today no clearly established national rule on—what legal standard to apply when an employee is fired for engaging in political *activity*. "The official cannot be expected to predict the future course of constitutional law," *Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978), particularly when we ourselves struggle with this difficult issue for the first time today.

■ Accordingly, we hold that the district court erred as a matter of law in denying Munoz qualified immunity. The federal law was simply not *clearly* established against his actions when he discharged Rodriguez. Defendant is immune from liability for money damages, and only plaintiff's claim for injunctive relief remains. This latter is a complex matter which, for reasons described below, must be reconsidered. In any event, there is no right to a jury trial, such as was held, on a claim purely for injunctive relief (unless a statute were to expressly so provide, which

is not the case). *See* 5 *Moore's Federal Practice* § 38.17 (2d ed. 1985); A. Wright & C. Miller, *Federal Practice & Procedure* § 2308 (1971). Thus, we vacate the district court's judgment, based on the jury findings, and remand for further proceedings consistent with our instructions below.

## B. *First Amendment Claim*

On remand, the district court should make factual findings of its own, relying, to the extent it wishes, on the present record and receiving further evidence as necessary. The court should determine the reasons for Rodriguez's dismissal—whether he was dismissed[4] because of his plans to run for political office, in opposition to a candidate whom Munoz supported, or whether he was discharged because of poor job performance. If the court concludes that plaintiff has met his burden of proving that the dismissal was motivated by reasons of politics, defendant may still be relieved of liability if he can show he would have dismissed Rodriguez even absent his political activity. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Assuming, however, that defendant does not successfully make out a *Mt. Healthy* defense, the court then must address plaintiff's first amendment claim.

In the trial below, the district court relied on *Elrod* and *Branti* for the proposition that the dismissal of a public employee from his job solely for "political reasons" violates the first amendment. However, in those cases the Supreme Court addressed specifically only the question whether a public employee could be discharged on the basis of his *political affiliation.* It held there was no state interest so vital as to override the "core" first amendment freedoms of belief and association, which would otherwise be infringed by the practice of political patronage. At the same time, however, the Court carved out a key excep-

tion to the general rule: persons could be dismissed on partisan grounds from positions in which the need for political loyalty was sufficient to override their ordinary associational and free speech rights. Such political firings are allowed so as to ensure that "representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod,* 427 U.S. at 367, 96 S.Ct. at 2687. Under this analysis, the question would be whether Rodriguez's regional directorship was one from which "political firing" was permissible. We have set forth the criteria applicable to answering this question in our recent en banc decision in *Jimenez Fuentes v. Torres Gaztambide,* 803 F.2d 1 (1st Cir.1986).

Defendant points out, correctly, however, that Rodriguez's claim does not conform to the *Elrod-Branti* mold. Even assuming that a patronage-type firing of someone in the *same* political party is covered by *Branti-Elrod,* the present claim seems to rest less on plaintiff's affiliation with a particular political group and more on his determination to run for office as a rival to someone else in the very same party. The constitutionality of terminating employment on the basis of an employee's political *activity* (here, plans to run for political office) should be tested, Munoz argues, by using the particularized balancing analysis described in *Pickering* and *Connick.* In those cases, the Supreme Court established that for a public employee to succeed on a first amendment claim, he has to prove that his speech is on matters of public concern, and that his interests in commenting on these matters outweigh those of the public employer in promoting efficiency, loyalty, and morale in the workplace. Rather than formulating a uniform standard, the Supreme Court left open the particular protection an employee's speech might receive, depending on both the character of the speech and its effect on government interests.

---

**4.** Although defendant contended at times during the proceedings below that Rodriguez, when informed that he would be transferred, voluntarily resigned, Munoz now concedes in his appellate brief that Rodriguez had indeed been discharged.

Given these two lines of Supreme Court precedents, formulating the proper constitutional test for a discharge based on partisan political activity[5] is a difficult, and vexed, task. *See* Note, *Politics and the Non-Civil Service Public Employee: A Categorical Approach to First Amendment Protection,* 85 Colum.L.Rev. 558 (1985). In a sense, what is before us is a hybrid case, implicating both political patronage on the one hand, and free speech on the other. The few circuits to have squarely faced a case involving a dismissal motivated by an employee's partisan political activity have settled on a variety of approaches,[6] none of which seem entirely satisfactory. Until further guidance is received from the Supreme Court, we lay down the following guidelines for the district court to follow in evaluating plaintiff's claim.

■ The legal standards the district court should apply here depend, in the first instance, on whether Rodriguez's job is best characterized as one where political affiliation is an appropriate requirement, thus allowing politically-based discharge— or whether it is a job of the kind *Elrod-Branti* give absolute protection against discharge because of political affiliation. Thus, the district court's first step is to examine the specific duties of Rodriguez's job, and to make this determination, guided by the freshly decided en banc decisions from this court, *Jimenez Fuentes v. Torres Gaztambide,* 803 F.2d 1 (1st Cir.1986), and *DeChoudens v. Government Development Bank,* 801 F.2d 5 (1st Cir.1986). Since we concluded in *Jimenez Fuentes* that the plaintiffs there, regional directors of a public corporation attached to the Commonwealth's Department of Housing, occupy "political" positions, the court may conclude that Rodriguez's position, also a regional directorship, is similarly a "political" one. We do not, however, venture to make this finding ourselves. Given the inadequacy of the record on this point, the district court should consider any additional facts bearing on the nature of the position, and then make the necessary determination.

If the court finds that plaintiff's position is indeed one for which political affiliation would have been a legitimate requirement under the standard in *Jimenez Fuentes,* the court should find that dismissal here was constitutionally permissible and enter judgment for defendant. This is so even though Rodriguez was fired for his political activity, not affiliation. In both *Elrod* and *Branti,* the Supreme Court only had occasion to examine the paradigm of a patronage dismissal case—a newly elected administration wants to replace holdover employees from the old administration, so that its policies will not be frustrated by employees with different political loyalties. But some courts have already expanded the *Elrod-*

---

5. By partisan political activity, we refer only to activity or expressive conduct related to contests for elective office. We do not address here the question of the appropriate constitutional test for cases involving any other activity or expressive conduct on general matters of public concern.

6. For example, in *McBee v. Jim Hogg County,* 730 F.2d 1009 (5th Cir.1984) (en banc), the Fifth Circuit viewed dismissals based on political activity as falling in the center of a spectrum anchored by pure patronage cases at one end and pure speech cases at the other. In a case involving the discharge of deputy sheriffs, several of whom had compaigned on behalf of their supervisor's politcal opponent, the *McBee* court rejected· the applicability of *Elrod-Branti,* and proposed a single balancing test under *Pickering-Connick* for all such mid-spectrum cases. *Jones v. Dodson,* 727 F.2d 1329 (4th Cir.1984), in contrast, proposed a two-step analysis for political activity cases. First the court asked whether the dismissal was motivated by "party affiliation alone" or by "overt speech activity." In the case of the former, *Elrod-Branti* would apply, if the latter—and apparently political activity would most likely fall into this category—then the *Pickering-Connick* balancing test would apply. *See also McCormick v. Edwards,* 646 F.2d 173, 176–79 (5th Cir.) (upholding the discharge of a "nonpolitical" employee for campaigning for another on grounds that state's interest outweighs employees's interest in such cases, relying on reasoning from Hatch Act cases), *cert. denied,* 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981). *Newcomb v. Brennan,* 558 F.2d 825 (7th Cir.1977) (upholding discharge of a deputy city attorney on grounds employee fell within the *Elrod* policy-making exception, and effect on political loyalty was sufficiently important to override first amendment right).

*Branti* doctrine to include discharge based on *intra*-party disputes that spring from an employee's support of his supervisor's political opponent.[7] *See Horton v. Taylor,* 767 F.2d 471 (8th Cir.1985); *Nekolny v. Painter,* 653 F.2d 1164 (7th Cir.1981). We think the reasoning that allows public employees holding "political" positions to be discharged because of their affiliation with a certain political group applies with equal force here where the discharge was in retaliation for the employee's decision to run for office in opposition to a same-party candidate of his supervisor's choice.

In *Elrod* and *Branti,* the Supreme Court recognized as paramount the state's interest in enabling officials to implement policies for which they must answer to voters, by permitting them to exercise patronage where "political" employees are involved. At the heart of this recognition is a concession—both practical and idealistic—that for a government to function properly employers must have the freedom (without court oversight) to choose those employees with the necessary political commitment as well as personal loyalty. Whether an incompatibility springs from differences in party affiliation, or from a clash of wills as to which political candidate to support,[8] since an employer's ability to effectively carry out his political agenda is nonetheless similarly affected, we see no reason on the facts of this case not to carve out the *Elrod-Branti* "political" position exception here. This is not to denigrate an individual's right to engage appropriately in political activity. *See, e.g., Elrod,* 427 U.S. at 356–57, 370–71, 96 S.Ct. at 2681, 2688; *Newcomb v. Reuss,* 558 F.2d 825, 829 (7th Cir.1977). But overt political activity by high-level or confidential government employees, even more than their affiliation with an opposing party, may frustrate le-

gitimate governmental and public interests. Political activity by a high-level employee has the potential to coerce the belief and associational freedoms of subordinates. *See infra.* The Supreme Court in *Elrod* recognized that prohibition of political activities may paradoxically be needed to safeguard the core interests of individual belief and association. The Court spoke of a hierarchy of first amendment rights:

if the First Amendment did not place individual belief and association above political campaigning and management, at least in the setting of public employment, the restraints on those latter activities could not have been judged permissible in [*United Public Workers v. Mitchell,* 330 U.S. 75 [, 67 S.Ct. 556, 91 L.Ed. 754] (1947), and *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548 [93 S.Ct. 2880, 37 L.Ed.2d 796] (1973), upholding the constitutionality of statutory restrictions of employees' political activities].

427 U.S. at 371, 96 S.Ct. at 2688. An example of how political activity may possibly interfere with individual first amendment rights exists in the present case, where the defendant has alleged that plaintiff used his position to advance his political career by favoring those who supported him. We think the same category of employees who, under *Elrod-Branti,* are properly open to discharge because of their political *affiliation* are likewise open to discharge because of political activities they may engage in, such as running for office as rivals to persons backed by their supervisors.

In contrast, if the district court decides that plaintiff occupies a position for which political affiliation is *not* an appropriate requirement, finding the proper balance be-

---

**7.** It is interesting to note that the Supreme Court in *Connick v. Myers,* 461 U.S. 138, 149, 103 S.Ct. 1684, 1691, 75 L.Ed.2d 708 (1983), characterized *Elrod* and *Branti* as recognizing that "official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights."

**8.** The Supreme Court in *Elrod v. Burns* acknowledged that partisanship may involve more than simply a pledge of allegiance to a particular party, but may involve working for or contributing to a particular candidate. 427 U.S. 347, 355–56, 363 n. 17, 96 S.Ct. 2673, 2680–81, 2685 n. 17, 49 L.Ed.2d 547 (1976).

tween his first amendment rights on the one hand, and the public employer's interest on the other, becomes much more elusive. Under the particular facts in *Elrod* and *Branti*, the Supreme Court struck a balance in favor of such "nonpolitical" employees, and declared that where discharge was motivated purely by reasons of political affiliation, the first amendment provided them with absolute protection against discharge. It could be that this categorical protection should be extended to an employee who, like Rodriguez, undertook, or so it is alleged, to run for political office. We decline to do so, however, for a number of reasons, and we direct the district court instead (should it reach the issue) to apply a balancing test tailored to the particular circumstances of this case.[9]

First, prohibiting all discharges based on an employee's political activity, regardless of the circumstances, would not be fully responsive to the government interests at stake. Unlike political affiliation alone, political activity carries with it the potential for direct disruption of employment relationships and the workplace, thereby affecting a government's ability to provide services to the public efficiently and effectively. *See Connick*, 461 U.S. at 140–51, 103 S.Ct. at 1686–92. This was a key concern in the free speech cases, and we believe it is present in political activity cases as well. We note that the *Elrod* Court, in distinguishing the case of pure affiliation from cases where legislative prohibitions of political activities were upheld, recognized that in the latter situation, government ef-

ficiency may well be affected. 427 U.S. at 366, 96 S.Ct. at 2686.

Another government interest missing from the *Elrod* and *Branti* analysis is that of the potentially adverse effect political activity by public employees may have on the political rights of others, and indeed on the electoral process itself. This concern is reflected in Congress's adoption of the Hatch Act, in particular section 9(a), which bans "active participation in political management or in political campaigns" by federal executive employees. 5 U.S.C. § 7324(a) (1982); *see generally Developments in the Law—Public Employment,* 97 Harv.L.Rev. 1611, 1651–60 (1984). In *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and again in *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Supreme Court upheld the Hatch Act's constitutionality, recognizing the legislative judgment that insulating the public workplace from partisan politics was important to safeguarding individual belief and association, and thereby the political process.[10] *See also Elrod,* 427 U.S. at 370–71, 96 S.Ct. at 2688 (noting that the Hatch Act may result in a net gain to representative government). While here there was no statutory prohibition against plaintiff's running for office—so that the mere fact he was a candidate, would not support his discharge except as his position falls within the *Elrod-Branti* "political" exception—proof that his candidacy adversely affected the job performance and rights of fellow em-

9. We, of course, outline only those federal constitutional standards that obtain in the absence of state regulation. If state law itself allows or prohibits political activities, different considerations may become involved. Puerto Rico, for example, would seemingly be entitled to give civil service job protection to all its employees, including those at the highest levels, if it so desired. By the same token, it could allow its employees to run for political office and make it an offense to discharge them for doing so.

10. The Supreme Court identified four specific interests advanced by the Hatch Act: 1) to en-

sure that employees administer the law "without bias or favoritism for or against any political party or group"; 2) to promote public confidence by creating the *appearance* of impartiality; 3) to prevent the government from becoming "a powerful, invincible, and perhaps corrupt political machine"; 4) to minimize political coercion of government employees, thus promoting merit rather than political performance. *United States Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548, 564–66, 93 S.Ct. 2880, 2889–90, 37 L.Ed.2d 796 (1973).

ployees would be relevant to a weighing of interest.[11]

While we recognize the unpredictability and broad judicial discretion that an ad hoc balancing test will create, case-by-case analysis still seems preferable to an inflexible categorical approach because, as a practical matter, public employees may engage in a variety of political activities under different factual circumstances—a variety to which discharge for reasons of political affiliation is not susceptible. The degree of first amendment protection which an employee's political activity is accorded depends to some extent on the exact nature of his conduct. Determining whether that activity is incompatible with the discharge of an employee's duties will also depend on the nature of the job, and the extent to which personal loyalty is necessary to a successful employment relationship. Moreover, the particular form of the express activity will also affect the various government interests to different degrees.

Thus, in carrying out the balancing test in event the district court concludes that a Regional Director of the Agency is not within the "political" position exception permitting discharge at will for political reasons, the court should consider, among other factors, the time, place and nature of plaintiff's political activities. For example, if an employee's activity takes place in the workplace and during working hours, the government's interest in an efficient workplace will be greater than if his activity is conducted outside the workplace during off hours. The court should also examine the nature of the job to see whether a close working relationship with others is necessary to the proper performance of his duties. If so, the effect of plaintiff's activity on discipline and morale in the office

should be noted. *See Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692. Additionally, the court should see whether plaintiff's activities affect defendant's ability to carry out the Agency's objectives, and whether his activities place any undue political pressures on his co-workers.

In summary, we hold the district court erred in denying Munoz qualified immunity since we conclude the law was not clearly established against his actions. As for the claim for injunctive relief, the court should first determine, pursuant to standards set out in our recent opinion in *Jimenez Fuentes v. Torres Gaztambide*, 803 F.2d at 6–7 (en banc), whether Rodriguez occupied a position for which party affiliation would be an appropriate requirement: if he did, the court should find for defendant under the *Elrod-Branti* exception; if not, the court must go on to determine whether the dismissal was constitutionally justified, weighing the first amendment rights of plaintiff against the various governmental interests that are material under the particular facts found to have existed.

*So much of the judgment of the district court as awarded damages to plaintiff is reversed. The remainder of the judgment is vacated and remanded for further proceedings consistent with this opinion.*

TORRUELLA, Circuit Judge (dissenting).

This circuit is well on its way to creating a whole body of special jurisprudential exceptions just for Puerto Rican political discharge cases. *See de Choudens v. Government Development Bank*, 801 F.2d 5 (1st Cir.1986) (Torruella, J., concurring) (*en banc* consideration without panel opinion); *de Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.1986) (Torruella, J., dissent-

---

11. Unlike the court in *McCormick v. Edwards*, 646 F.2d 173 (5th Cir.), *cert. denied*, 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981), we do not rule that *Letter Carriers* "controls" all cases involving discharge of public employees based on their partisan political activities, even where no statutory prohibition of such activities exists. *See McCormick*, 646 F.2d at 179–80 (Johnson, J., dissenting) (criticizing the majority opinion for concluding that employee's partisan

activities fall within the *Letter Carriers* line of cases when there was no generic prohibition of political involvement applicable to plaintiff). Rather, we simply propose that the government interest embodied in the Hatch Act, and affirmed in *Letter Carriers*, be given due weight to the extent relevant (on the particular facts) in determining whether a given discharge passes constitutional muster.

ing) (rules applicable to summary judgment); *Jimenez Fuentes v. Torres Gaztambide*, 803 F.2d 1 (1st Cir.1986) (Torruella, J., dissenting) (findings under Rule 52(a) Fed.R.Civ.P.). The exception espoused by the majority in this case exempts appellants from the well-established rule that prohibits parties from raising on appeal issues not argued in the first instance before the district court. *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *Latinos Unidos de Chelsea v. Secretary of Housing*, 799 F.2d 774, 791 n. 26 (1st Cir.1986); *Wightman v. Bureau of Alcohol, Tobacco & Firearms*, 755 F.2d 979, 983 (1st Cir.1985); *Cajigas v. Banco de Ponce*, 741 F.2d 464, 466–67 (1st Cir.1984); *Cohen v. President and Fellows of Harvard College*, 729 F.2d 59 (1st Cir.), *cert. denied*, 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984); *Codex Corp. v. Milgo Electronic Corp.*, 717 F.2d 622, 629 (1st Cir.1983), *cert. denied*, 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 191 (1983); *Eagle-Picher Industries, Inc. v. Liberty Mut. Ins.*, 682 F.2d 12, 23 n. 8 (1st Cir.), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1982); *Furtado v. Bishop*, 604 F.2d 80, 87 (1st Cir.), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1979); *Needleman v. Bohlen*, 602 F.2d 1 (1st Cir. 1979); *McPhail v. Municipality of Culebra*, 598 F.2d 603, 607 (1st Cir.1979); *Johnston v. Holiday Inn, Inc.*, 595 F.2d 890, 894 (1st Cir.1979); *Gual Morales v. Hernández Vega*, 579 F.2d 677, 681–82 (1st Cir.1978). In *Johnston* we indicated that the rule would be "relaxed only in 'horrendous cases where a gross miscarriage of justice would occur'." *Johnston, supra* at 894. In *McPhail* we said that "[a] party may not 'sandbag' his case by presenting one theory to the trial court and then arguing for another on appeal." *McPhail, supra* at 607.[12] Although the majority acknowledges the applicability of this rule "except in rare cases where paramount considerations of justice require," *see* at 140, it views appellant's "powerful" arguments as requiring that such an exception be allowed in this case.

At the district court level appellant considered that plaintiff's discharge dealt with *Elrod-Branti*[13] issues, i.e., discharge because of political *affiliation*. All the evidence and argument presented by the parties, as well as the district court's decision was so focused. Presumably inspired by the passage of time, appellant now believes that plaintiff's discharge was because of his political *activities* and asks this court to engage in original decision-making based on an altogether different theory grounded on the *Pickering-Connick* line of cases.[14] Not content with that lapsus, appellant also seeks to raise for the first time on appeal as part of its qualified immunity defense from damages, that at the time of plaintiff's discharge the law was "by no means clearly established ... [that] plaintiff's position was of the type protected under *Elrod* and *Branti*." *Ante* p. 140.

We are not dealing here with a *pro se* defendant, but rather one represented by able counsel, including the Department of Justice of Puerto Rico. This, of course, should make no difference as we have not hesitated to apply the rule against "sandbagging" even to *pro se* litigants. *See Wightman, supra.* It should not be too much to expect that parties represented by counsel of the caliber here involved be held accountable to at least as strict a standard, particularly since the issues now raised are not of new creation. *See Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Pickering v. Board of Edu-*

---

**12.** The term "sandbagging" is an old sailboat racing term, referring to the use of sandbags for ballast, which in turn were moved about the boat's hold depending on how the wind blew. Interestingly enough, "sandbagging" is no longer permitted in sailboat racing.

**13.** *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

**14.** *Pickering v. Board of Education*, 391 U.S. 563, 95 S.Ct. 992, 43 L.Ed.2d 214 (1968); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

*cation,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). I know of no valid reason why appellants failed to raise the new issues at the district court level—other Puerto Rican defendants have done so in an appropriate manner—*e.g., de Abadia, supra.* The reason given for excusing appellants from compliance with the anti-"sandbagging" rule, the alleged vagueness in the scope of high-echelon jobs to which *Elrod-Branti* is applicable, has nothing to do with the newly raised *Pickering-Connick* arguments, which depend on a scrutiny of the public employee's conduct (*e.g.,* speech content) to determine if it is constitutionally protected. There is no vagueness in the *Pickering-Connick* situation which was clarified by our recently decided cases of *de Abadia, Torres Gaztambide* and *de Choudens.* They did not involve *Pickering-Connick* issues.

This situation is aggravated because, as the facts recounted in the majority opinion clearly imply, *ante* at p. 142, defendants specifically decided below not to argue the lack of clarity in the law as grounds for a qualified immunity defense. The record reflects that "[e]ven when the trial judge, noting that 'under the facts [he was] not going to accept that this is an area of uncertainty [in] the law,' pressed defendant's counsel for any decisions indicating that this case involved a 'dubious grey area [ ] of civil rights,' he conceded that Muñoz' actions, if proven, were clearly unconstitutional." *Id.* This is not an innocent oversight—it is a conscious waiver of a defense by trial counsel. Defendant should not be allowed to resurrect this defense on appeal.

Far from the "horrendous" scenario envisioned by this Court in *Johnston, supra,* as triggering an exception to the rule, what we have in this case is pure, unadulterated second guessing by the government defendant—"sandbagging"—which this court should not tolerate, much less excuse.

Entering the merits of the newly raised questions on appeal, I must say with all due respect to the majority, that in determining that appellant is entitled to qualified immunity on damages, it continues to misread the Supreme Court's admonition in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), to the effect that:

> All [the appellate court] need determine is a question of law: whether [1] the *legal norms* allegedly violated by defendant were clearly established, or [2] in cases where the district court has denied summary judgment for the defendant on the ground that, even under the defendant's version of the facts the defendant's conduct violated clearly established *law,* whether the *law* clearly proscribes the *actions* defendant claims he took.

105 S.Ct. at 2816 (emphasis supplied). The *law, i.e.,* you cannot discharge an employee solely for political reasons unless "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved," [15] *was* clearly established when plaintiff was discharged in this case. *See de Abadia, supra,* Appendix at 1209–1210 (Torruella, J., dissenting).

That the *law* was clearly established in 1983 is reflected by defendant's actions below. Again referring to the majority's opinion, *ante* at p. 142, it finds that "[defendant] curiously made no argument that [the law] was not clearly established in March 1983." I find nothing "curious" about this situation. The fact is that everyone concerned with this case, except our Court when it decided *de Abadia,* thought that the *law* in question was clearly established, and that is why defendant failed to raise that defense and "conceded that [his] actions, if proven, were clearly unconstitutional." *Id.*

To my knowledge, the First Circuit is the only court to have ruled that *Branti* is not clearly established *law* because the particular job being litigated has not previously been passed upon by the courts. If the majority opinion becomes the established law of the land, *Branti* will be meaningless. We will have interminable *ad hoc*

---

15. *Branti, supra* 445 U.S. at 518, 100 S.Ct. at 1295.

litigation for every job description of every governmental position, federal, state, county, and municipal, before the "law is clearly established" for each such position. I cannot believe that is what the Supreme Court countenanced in deciding *Branti*. *Cf.* at p. 146.

In the alternative, if this is a *Pickering-Connick* situation, I fail to see how it is possible to say that the law was not clearly established. *Pickering* dates back to 1968, not that it should come to anyone's surprise that, in this day and age, discharging an employee for aspiring to run for public office is violative of some constitutional provision.

Last but not least, while I may personally favor a statute similar to the Hatch Act, 5 U.S.C. § 7324 for Puerto Rico, since the Legislature of Puerto Rico has not seen fit to enact such a statute, I think it inappropriate for this court to curtail, by judicial *fiat*, the right of public employees in Puerto Rico to engage in such activities. *See* p. 145–46.

I dissent.