Gerard BENOIT, Plaintiff,

v.

William F. WELD, Robert J. Cordy, Defendants.

Civ. A. No. 91–12314–MA.

United States District Court, D. Massachusetts.

March 5, 1992.

---

Matthew Cobb, Law Office of Esther C.S. Dezube, Boston, Mass., for plaintiff.

Jon Laramore, Atty. General's Office, Boston, Mass., for defendants.

MEMORANDUM AND ORDER

MAZZONE, District Judge.

Plaintiff Gerald Benoit ("Benoit") filed this suit against William F. Weld ("Weld") and Robert J. Cordy ("Cordy") under 42 U.S.C. § 1983, alleging violations of: 1) liberty and property interests under the Due Process Clause of the Fourteenth Amendment; 2) the right to political association and freedom of association under the First and Fourteenth Amendments; and 3) the Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H and 11I, all in connection with his termination as the Director of Claims Administration for the Commonwealth of Massachusetts' Department of Industrial Accidents. Defendants Weld, the Governor of Massachusetts and Cordy, the Governor's Legal Counsel, have moved for summary judgment pursuant to Fed. R.Civ.P. 56 arguing that Benoit cannot succeed on any claim set forth in the complaint. After careful review of the motions, affidavits and exhibits, and substantial discussion of the issues during oral argument, the motion for summary judgment is granted.

## I. FACTUAL ALLEGATIONS

The pleadings, affidavits of William F. Weld, Robert J. Cordy, Walter Horn and David M. McDonald and attached exhibits filed by the defendants establish the following facts. On June 19, 1991, Gerald Benoit was appointed Director of Claims Administration of the Massachusetts Department of Industrial Accidents. This position, classified at the managerial level as M–VI (see M.G.L. c.30 § 46C), is potentially a policymaking one, with the opportunity for considerable interaction with the public.[1] The Director supervises more than four dozen employees and has effective hiring and firing authority over several senior employees. In addition, the Director has unlimited access to confidential information in worker's compensation files.

---

1. One past holder of the position participated extensively in policymaking with respect to appellate procedures and conciliation; another made many presentations to business and insurance groups on the Department's behalf.

In late June, 1991, Weld learned of certain allegations against Benoit, namely, that for the seven years prior to his appointment, Benoit had been collecting worker's compensation for total and permanent disability. Benoit had settled his worker's compensation claim for a lump sum of $63,000 on March 21, 1991, just prior to actively seeking employment in state government. A top priority of Governor Weld's has been the reform of the Massachusetts worker's compensation system.[2] Prior to Benoit's appointment, neither Weld nor Cordy knew that Benoit had been collecting worker's compensation. Upon learning of this, Weld directed Cordy, his Legal Counsel, to fully investigate the allegations. Cordy's office directed the State Police to conduct an investigation, which included reviewing Benoit's worker's compensation claims and the activities he performed while collecting worker's compensation.

After a preliminary inquiry revealed a series of potential misrepresentations by Benoit, Cordy consulted with Mark Robinson of Governor Weld's staff and together they determined that Benoit should be suspended. Robinson orally informed Benoit of his suspension on June 28, 1991 and instructed him not to return to work on July 1, 1991. Robinson told Benoit he would receive back pay if, at the conclusion of the investigation, the suspension was deemed not to have merit. Cordy's office prepared a suspension letter which John Lane, Commissioner of the Department of Industrial Accidents, gave to Benoit on July 1, 1991. Around this time, Cordy requested the State Police Office of Special Investigations to further investigate the matter, and also to investigate the representations Benoit made during the process of his hiring.

At the conclusion of the State Police investigation, Cordy called a meeting with Benoit, Benoit's attorney Robert Crowley, State Police Officer Pugsley and State Police Sargent Richard White, which took place on July 29, 1991. At this meeting, Cordy reviewed the specific results of the investigation, including work Benoit performed while he was collecting worker's compensation for total and permanent disability and specific misrepresentations on his resume. Cordy then invited Crowley to respond to the results of the investigation.[3] Crowley agreed to respond to the allegations in two days. Within three days, Crowley contacted Cordy and informed him that Benoit denied all of the information in the report. Cordy specifically asked about Benoit's relationship to Town Hill Dry Cleaners. The investigation showed that Benoit had placed newspaper advertisements in person and had them billed to his home address. Benoit's attorney responded that Benoit had no connection or working relationship with Town Hill. Cordy then spoke with State Trooper Pugsley and confirmed that the advertisement was in fact placed by Benoit in person.

Benoit produced no evidence to rebut the findings of the investigation. As a result, Benoit was terminated from his position by Commissioner Lane on August 2, 1991. Neither Weld nor Cordy was aware of Benoit's stated association with the Kennedy[4] family until after the filing of this lawsuit.

Benoit sets forth a slightly different version of relevant events. The pleadings, affidavits of Gerald Benoit, John R. Lane and Robert W. Crowley and exhibits submitted by Benoit establish the following facts. Prior to settling his worker's compensation claim, Weld promised Benoit a job within his administration at the Department of Industrial Accidents. Benoit states Weld attended a fundraiser in Charlestown which Benoit organized on Weld's behalf. At that time, Weld was aware Benoit was previously injured and

---

**2.** Governor Weld's worker's compensation reform act was signed into law on December 24, 1991.

**3.** By this point, Benoit had left the meeting, so Crowley was asked to respond on his behalf. Aff. of Cordy Para. 10.

**4.** This alleged relationship is discussed more thoroughly in Plaintiff's version of the facts.

on worker's compensation. Furthermore, Weld knew Benoit was acting as a volunteer arbitrator while on worker's compensation. In fact, Weld's representation to Benoit that he would receive a position within his administration was the reason Benoit settled his worker's compensation claim. After Weld won the election, Benoit was told by Denis Martin, Labor Secretary Christine Morris's Chief of Staff and by Secretary Morris to "hurry up and settle" his worker's compensation claim so that the Governor could appoint him to the position. In addition, Weld was aware Benoit had previously supported Representative Joseph P. Kennedy, II and also knew that Benoit began supporting Weld only because Kennedy had decided not to run.

Benoit agrees there was a July 29, 1991 meeting between Benoit, Benoit's attorney Robert Crowley, Cordy and two State Police officers regarding the results of the investigation. Benoit states Crowley told him to attend the meeting as it concerned his lump sum worker's compensation settlement. However, at the meeting, Benoit and Crowley were informed only that: 1) two items on Benoit's resume were misleading; and 2) that Benoit was seen driving his brother-in-law's delivery van in Charlestown while collecting worker's compensation. In addition, during the meeting, Cordy told Benoit that "if you don't resign, Lane will be instructed to fire you and we will prosecute you."

Cordy never made the specific results and findings of the investigation available to Crowley. Crowley lists eleven additional charges of which neither he nor Benoit were informed, such as allegations that a majority of statements Benoit made on his resume were in question, that Benoit placed advertisements in the newspaper and that he climbed ladders in conjunction with two political campaigns. Benoit states that neither he nor Crowley were asked to respond to the results of the investigation, either during the meeting or any time thereafter. Crowley states that Benoit did not rebut the allegations because Cordy did not adequately inform Be-

noit of them nor did he give Benoit an opportunity to respond. The first time Benoit saw all of the allegations against him was when his current attorney showed him a copy of the State Police report. Crowley also saw the report for the first time when Benoit's current attorney provided him with a copy. Benoit maintains he can "successfully rebutt (sic) with hard evidence each and every charge made against [him] in the bogus, unsubstantiated police report."

## II. DISCUSSION

Summary judgment may be granted if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). All reasonable inferences are to be drawn in favor of the party against whom the motion is directed, in this case, Benoit. *Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir.1990). Defendants argue that summary judgment should be granted on each of the three claims set forth by Benoit. First, Benoit had no property interest in his employment and therefore as a matter of law was not denied due process of law. Second, Benoit received all the process he was due, and therefore as a matter of law was not deprived of a liberty interest under the due process clause. Third, the factual record shows that the allegations that he was fired for political reasons are false. Furthermore, since his appointment was political in nature, he could be terminated for political reasons. Consequently, no First Amendment freedom of association or political association violations exist.

### A. *Property Interest*

■ Plaintiff advances three theories under which he claims to have a property interest in his position as Director of Claims Administration. First, he argues he is a tenured civil service employee under M.G.L. c. 31 § 34. As such, any person terminated after thirty days on the job[5] but before the conclusion of the six month probationary period must be given written

---

5. Benoit was terminated after forty three days    on the job.

notice which states the unsatisfactory nature of his work in detail. If such notice is not given, then that person will be deemed a tenured employee at the end of the six month probationary period. M.G.L. c. 31 § 34. Since such written notice was never given, Benoit argues he is a tenured employee.

Defendants take exception to this classification. Since Benoit was a M–VI manager, he was not covered by the civil service statute. M.G.L. c. 30 § 46E provides:

Notwithstanding any provision of law to the contrary ... no position allocated to job group M–V through job group M–XII, inclusive, of the management salary schedule provided in section forty-six C shall be classified under chapter thirty-one ...

Furthermore, M.G.L. c. 30 § 46F entitled "Tenure" states:

Notwithstanding the provisions of sections nine A, nine B and nine D [6] of this chapter or any other provision of law ... no person appointed to a position allocated to job group M–V through M–XIII, inclusive, of the management salary schedule provided in section forty-six C shall acquire tenure in any such position.

Benoit is a M–VI manager, and clearly falls within the statutory exclusion from tenure. Benoit is not entitled to the protection of chapter 31 nor is he entitled to tenure of any kind.

Second, Benoit argues that he possessed *de facto* tenure because he had a clearly defined promise of continued employment in his job from Weld, which created a property interest. In addition, Benoit argues that a property interest arose as a result of an implied covenant of good faith and fair dealing in his contract of employment with the Commonwealth. In support of both propositions, Benoit cites *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). There, the Court held that a college professor without a formal contract who was denied tenure may have a property interest in his employment since the college had a *de facto* tenure program. The plaintiff relied on a provision in the

official Faculty Guide of the college which made certain representations as to tenure, and on the guidelines of the college regarding tenure.

With reference to implied contracts, the *Perry* court discussed that "there may be an unwritten "common law" in a particular university that certain employees shall have the equivalent of tenure." *Perry*, 408 U.S. at 602, 92 S.Ct. at 2700. The Court explained that a university may not have an explicit tenure system in place, but that "nonetheless may have created such a system in practice." *Id.*

In the instant case, there were no analogous rules or understandings which were officially promulgated by the Commonwealth. The Massachusetts legislature specifically stated that employees of Benoit's rank shall not acquire tenure in their position. M.G.L. c. 30 § 46F. The Commonwealth has not created an environment where officials appointed to policy making positions are made to feel they have an interest which rises to the level of a property interest. "[P]ersons of high office do not acquire the protections acquired by employees of lesser rank." *O'Connor v. City Manager of Medford*, 7 Mass.App.Ct. 615, 389 N.E.2d 440 (1979) (holding that civil service employee later appointed to division head, a policy making position, was not entitled to the protections of civil service statute). Therefore, the argument that Benoit possessed a property interest in his employment fails.

B. *Liberty Interest*

Plaintiff argues he has a liberty interest which was infringed upon when Defendants disseminated false and defamatory charges about Benoit, stigmatizing his freedom to obtain other employment. The First Circuit has stated the test for a liberty interest which triggers the Fourteenth Amendment's procedural due process requirements is as follows:

[W]here an employee lacks a property interest in his employment, the due process requirement that he be afforded a

**6.** Sections nine A, B and D do not apply in Benoit's case.

hearing at which he may seek to clear his name is triggered only if the dismissal is based upon false and defamatory charges that are disseminated by the employer and stigmatize the employee so that the employee's freedom to obtain alternative employment is significantly impaired.

*Ortega,* 917 F.2d at 74. The Supreme Judicial Court of Massachusetts has also discussed the hearing requirements in such a situation.

The hearing required where a nontenured employee has been stigmatized in the course of a decision to terminate his employment is solely 'to provide the person an opportunity to clear his name' ... Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required.

*Smith v. Commissioner of Mental Retardation,* 409 Mass. 545, 550, 567 N.E.2d 924 (1991) (quoting *Board of Regents v. Roth,* 408 U.S. 564, 573 n. 12, 92 S.Ct. 2701, 2707 n. 12, 33 L.Ed.2d 548 (1972)).

Benoit has submitted a series of newspaper articles which discuss his termination. None of these articles, however, contain information which would create a false or defamatory impression of Benoit. Commissioner Lane's suspension letter refers to "investigations" of Benoit's worker's compensation claim and employment application. Similarly, the termination letter refers to "an investigation ... the results of which have been reviewed with you and your counsel." Plaintiff draws attention to two statements: 1) a June 29, 1991 article containing a statement made by the Governor's office that "[i]f the review finds no evidence of impropriety surrounding this matter, Benoit will be reinstated with back pay"; and 2) an August 3, 1991 article where the Governor's spokesperson "said the investigation uncovered 'enough reasonable cause' to justify the termination," but that the State Police inquiry was still continuing, and there would be no further comment. Benoit charges that these two statements "combine[d] to tell the reading public that Benoit's (alleged) acts—the full

extent of which are still unknown to Benoit—were improper and illegal."

These statements are not false, nor did they defame Benoit. In fact, from the articles, it appears that the Governor's office and Commissioner Lane took steps to refrain from discussing the particulars of Benoit's situation.

As a nontenured employee without a property or liberty interest in his employment and whose employer did not create or disseminate a false or defamatory impression about him, Benoit was not entitled to a hearing under the law. Defendant Cordy, however, met with Benoit and his counsel to review the findings of the State Police. Defendants maintain Benoit was given an opportunity to respond to the findings; Benoit and his attorney maintain they were not. Since no hearing was required by law, the factual dispute between the parties is irrelevant.

## C. *First Amendment*

Benoit argues his political affiliation with Representative Joseph P. Kennedy, II a Democrat and "political rival" of Governor Weld, a Republican, and the fact that he was a "political embarrassment" for the Governor were substantial or motivating factors in his termination and thereby in violation of his First Amendment rights of freedom of association and political affiliation. Both Weld and Cordy deny any knowledge of Benoit's prior affiliation with the Kennedy campaign prior to the commencement of this lawsuit. Benoit contends Weld knew of this affiliation.

■ Assuming Weld knew of Benoit's previous support of Representative Kennedy, Plaintiff has not pled facts showing it was a substantial or motivating factor for his removal. *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (holding that protected conduct must be a substantial or motivating factor in the decision not to rehire); *see Rodriguez Rodriguez v. Munoz Munoz,* 808 F.2d 138, 143 (1st Cir.1986) (applying the *Mt. Healthy* test in the case of dismissal).

Even if Benoit had made such a showing, his position as a high level administrator places him in a category of employees who may be subject to termination due to the political nature of their position.

The First Circuit has recognized the state's interest in "enabling officials to implement policies for which they must answer to voters" and that a government must have "the freedom ... to choose those employees with the necessary political commitment as well as personal loyalty." *Rodriguez Rodriguez*, 808 F.2d at 145. As a result, the First Circuit has carved out an exception in the employment context permitting discharge at will for political reasons. As a high level employee, Benoit's position falls squarely within this exception. He was a director of a large department responsible for administrating the Commonwealth's worker's compensation system, the reform of which was of paramount importance to Defendant Weld. He had policymaking responsibility and access to confidential documents. Assuming again that Defendants did know of his Kennedy connections, Benoit could have been legally terminated for political reasons. *Figueroa–Rodriguez v. Lopez–Rivera*, 878 F.2d 1478, 1480 (1st Cir.1989) (explaining political considerations are appropriate criteria for positions which potentially concern matters of partisan political interest and involve a modicum of policymaking responsibility, access to confidential information or official communication).

One of Governor Weld's top political priorities was the overhaul of the worker's compensation system. An investigation revealed that Benoit, the new director, was collecting worker's compensation for total and permanent disability and that he had performed certain jobs while collecting worker's compensation. While Benoit continues to assert that he can disprove each claim, he has yet to offer any such evidence.[7]

On a motion for summary judgment, "[u]nsupported allegations are insuf-ficient to create a genuine dispute. Once the movant has presented probative evidence establishing its entitlement to judgment, the party opposing the motion must set forth specific facts demonstrating that there is a material and genuine issue for trial." *Ortega*, 917 F.2d at 73. Benoit has not supported his continued denial of the investigation's findings with specific facts. Therefore, his denials cannot be said to constitute a genuine dispute. When Benoit did not produce evidence to rebut the charges, Benoit was terminated from his position as Director. In light of the political nature of his position, his verified misconduct with respect to the worker's compensation system, the very system he was appointed to administer, made the termination politically necessary.

### D. *Massachusetts Civil Rights Act*

The remaining claim against Defendant Cordy under the Massachusetts Civil Rights Act is before the Court by virtue of its pendant jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Gilbert v. City of Cambridge*, 932 F.2d 51, 67 (1st Cir.1991). In situations such as this, where "all the federal claims are dismissed before trial," the Supreme Court has suggested that "the state claims should be dismissed as well." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. Since the federal claims have been dismissed, I decline to retain jurisdiction over the state claim.

### III. CONCLUSION

The motion for summary judgment on all § 1983 claims is granted. The claim under the Massachusetts Civil Rights Act is dismissed for lack of pendant jurisdiction.

SO ORDERED.

---

**7.** This is also true for the alleged misrepresentations made on his resume regarding his qualifi-cations.