Nancy M. CARUSO, Plaintiff–Appellant,

v.

Elaine K. DE LUCA and City of
Oakbrook Terrace, Defendants–
Appellees.

No. 95–2741.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1996.

Decided April 11, 1996.

Patrick K. Bond (argued), Mirabella & Kincaid, Wheaton, IL, for Plaintiff–Appellant.

Gary Feiereisel (argued) and Frank Kasbohm, Fraterrigo, Best & Beranek, Chicago, IL, for Defendants–Appellees.

Before CUDAHY, FLAUM and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Nancy Caruso, formerly the Deputy Clerk of the City of Oakbrook, Illinois, brought this action against the Clerk and the City when the Clerk decided not to reappoint her to another term. Ms. Caruso claims that she was not reappointed because she opposed the Clerk in an election. The district court granted summary judgment for the Clerk and the City. Ms. Caruso now appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

Nancy Caruso began working for the Oakbrook Terrace Clerk's office in a part-time clerical position in September 1986. In November 1986, she was appointed to the position of Deputy Clerk by the former City Clerk, Roberta Greninger. In April 1989, Elaine De Luca became the City Clerk. Ms. De Luca reappointed Ms. Caruso to the Deputy Clerk's position and continued to reappoint her annually over the next three years.

The Oakbrook Terrace Clerk's office is responsible for providing several services to the public: It issues business licenses, performs payroll and accounts payable duties, issues vehicle stickers to residents and answers residents' questions and phone calls. The Clerk's position was a part-time one, about ten to fifteen hours each week. The Deputy Clerk's position, in contrast, was a full-time job. By ordinance, the Deputy Clerk had the authority to act as Clerk in the Clerk's absence. In addition to the Clerk and Deputy Clerk, the office had two or three other part-time workers.

Prior to the election held in the fall of 1992, the City aldermen discussed the possibility of changing the Clerk's position to a full-time one and reducing the Deputy Clerk's position to a part-time job. Ms. Caruso learned of this possibility from Ms. De Luca during the fall of 1992. She decided that she would run for the position of City Clerk in the 1992 election; her sole motivation for running was her desire to ensure that she had a full-time job. The decision to run for the office required that she oppose Ms. De Luca in the election.

The record does not reveal that either Ms. Caruso or Ms. De Luca ran for the office with the sponsorship of a political party; at oral argument, counsel for Ms. Caruso represented to us that each ran as an individual—not as a Democrat, a Republican or otherwise. In the fall 1992 election, Ms. De Luca defeated Ms. Caruso and thus continued in the City Clerk's position. Two days after the election, Ms. De Luca informed Ms. Caruso that she would not be reappointed to the position of Deputy Clerk when her term expired in April 1993. A new Deputy Clerk was appointed to take Ms. Caruso's place, and the appointment was ratified by the Oakbrook Terrace City Council.

According to Ms. De Luca's deposition, she decided not to reappoint Ms. Caruso as Deputy Clerk because she believed she "couldn't

trust her if she ran against me." R.26, Ex. D at 55–56. Ms. De Luca understood Ms. Caruso's election challenge to convey the message that Ms. De Luca wasn't "doing a good job" as City Clerk. *Id.* at 56. Ms. De Luca's distrust was apparently based, at least in part, on events that occurred during the election. In one instance, Ms. Caruso circulated campaign literature in the form of a "report card" on the candidates. One of the issues listed on the report card was whether the Clerk's office should be opened one evening during the week or on a Saturday, in order to accommodate those who could not go to the office during its regular business hours. Under Ms. De Luca's name, Ms. Caruso wrote "rejected in 1991," indicating that Ms. De Luca had refused to open the office after-hours. *Id.* at 85. As Ms. De Luca recalled the 1991 decision, however, the decision had been arrived at collectively, after discussions with all of the office staff, including Ms. Caruso.[1]

1. Ms. De Luca recalled the incident in her deposition:

   Q: Did you discuss with Nancy Caruso whether she would be willing to be in the office that one night a week if that's what was done?
   A: I mentioned that I could not be in there all the time on Thursdays; it was hard for me and yet I didn't—since Nancy was the only full-time employee, it was kind of hard to add more hours on and not be able to add overtime and start with comp time again. And a couple of the girls don't live nearby. Mrs. Bosch had her evenings planned.
   So it became kind of a haphazard thing. And we thought since everything except registering someone to vote could be done by [the] police department 24 hours that I thought it was a mutual decision to not bother with it at this time until we got a water bill or started charging for vehicle tags or something else that would make us collect money.
   Q: Did you get the impression that Nancy Caruso did not want to work those evening hours?
   A: I felt that both of us felt it wasn't worth it at the time.
   R.26, Ex. D at 85–86.

2. In her deposition, Ms. De Luca refers to the changes that she anticipated:

   Q: Did you feel that you could not work with Miss Caruso on a day-to-day 40-hour a week basis?

In another election incident, Ms. De Luca put up a sign across the street from a polling place. She later learned, from her husband, that a sign for Ms. Caruso had been placed directly in front of her sign, blocking it from view, "even though there was room half a block either side for signs." *Id.* at 88. Ms. De Luca stated that she "just felt that wasn't nice." *Id.*

Ms. De Luca's deposition indicates that the election incidents were linked to another reason for her failure to reappoint Ms. Caruso—the restructuring of the Clerk's office. Following the 1992 election, the City Clerk became a full-time position. Ms. De Luca anticipated that this change would have a significant impact on the interpersonal dynamics of the office. Her deposition testimony reveals that she was concerned with Ms. Caruso's presence in the office; Ms. Caruso, because of her many years of experience in the office, may have been resistant to the changes that Ms. De Luca wanted to implement.[2]

   A: I thought there might be some problems kind of like when you run into a situation where someone has been there 40 hours a week and now you have someone new there and in our small office I would have to say not only was a working relationship there were friendships involved, and I thought it might be awkward to come in and try and change things and be told well, we always did it this way and you are sitting there saying well, I want it done this way. So if there was a new person, it might not happen; or if the person wasn't there before, they wouldn't know how it was before.
   R.26, Ex. D at 35–36.
   Q: How is it you couldn't trust her? What led you to believe that you wouldn't be able to trust Nancy Caruso if she continued as Deputy Clerk of the City of Oakbrook Terrace?
   A: Like I said prior, I think if you have two people, 40-hours a week and one's been there and one hasn't, you have problems there already. You have friendships that are made and women can be interesting to work with and just some goofy things that happened probably during the election that I was disappointed with.
   *Id.* at 56–57.
   Q: When you were testifying about wanting someone new who you could trust after you were becoming a full-time Clerk after that election, was there something about Nancy Caruso maintaining that position as Deputy Clerk that led you to not want to reappoint her as Deputy Clerk so you would both be in full-time positions in that regard?

Ms. Caruso sets forth two counts in her complaint: first, that by firing her, Ms. De Luca and the City violated her First Amendment rights to free expression and free association; second, that the firing violated her procedural due process rights. The defendants moved for summary judgment.

The district court granted the defendants' motion for summary judgment on both counts. Ms. Caruso has not appealed the judgment on her procedural due process claim. The court held that the political firing claim could not survive. It noted that Ms. Caruso held the second-ranking position in the office and, therefore, took over the duties of the Clerk when the Clerk was unavailable. Because the court believed that Ms. De Luca had a right to the loyalty of her Deputy Clerk and to "amity and efficiency" in the office, it reasoned that Ms. De Luca "could constitutionally decide that she ought to look elsewhere than her opponent in the last election in order to find such a number two." *Caruso v. De Luca,* No. 94–C–2733, 1995 WL 368881, at *1 (N.D.Ill. June 19, 1995). Ms. Caruso appeals the judgment based on that ruling.

## II

## DISCUSSION

### A.

■ The district court approached this case as one governed by the holdings of the Supreme Court in *Branti v. Finkel,* 445 U.S. 507, 516, 100 S.Ct. 1287, 1293–94, 63 L.Ed.2d 574 (1980), *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), and the cases of this court that implement the methodology of that line of cases, *see, e.g., Upton v. Thompson,* 930 F.2d 1209 (1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). This approach forbids the refusal to hire or the discharge of a public employee on the basis of political affiliation unless it can be shown that the position is one for which political

loyalty is necessary to the proper discharge of governmental responsibilities. This analytical approach is, however, a "particular subset of the wider category of discharges based on the First Amendment" governed by the Supreme Court's decisions in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Heideman v. Wirsing,* 7 F.3d 659, 662 (7th Cir.1993). The line between those cases that are appropriately analyzed under *Branti* and those that ought to be analyzed under the *Connick–Pickering* methodology is not a "stark" one. *Heideman,* 7 F.3d at 662.

Upon examination of the summary judgment record in this case, we believe that the broader *Connick–Pickering* analysis provides the most sure-footed analytical path. We do not deal here with the loss of a governmental position because of one's political affiliation with, or support of, a particular group or political party. Indeed, the record does not disclose that Ms. Caruso stood for office as the candidate of any party, and counsel informed us at oral argument that in fact she had not. Moreover, according to her deposition testimony, Ms. De Luca did not seek to justify her action on the ground that the position of Deputy Clerk required political loyalty, but on the ground that a smooth working relationship was not possible between the two because of specific incidents that caused Ms. De Luca to lose trust in Ms. Caruso, who would be "second in command" in the small office. We do not have, in this case, the "individual and governmental interests [that] are essentially unvarying" in patronage cases—a situation that places the focus "less on the expressive activity" and more "on the office occupied by the person engaging in that activity." *Heideman,* 7 F.3d at 662. Rather, we have an employer's incident-specific response to speech that she considered would make a future working relationship impossible.

A: Like I just stated, I just thought it would be harder to have someone that's been there five, six years in that position of full-time and with the friendships that were made in that office to have me come in and decide to

change something and end up with well, we did it this way; why do you want to change a routine? That I felt was a real possibility. *Id.* at 86–87.

Under the Supreme Court's holding in *Connick v. Myers,* we first must determine whether Ms. Caruso's speech addressed a matter of public concern or a matter of private interest to the employee. This inquiry must focus on the content, form and context of the employee's speech, as revealed by the whole record. *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. As Judge Flaum noted in *Wright v. Illinois Department of Children & Family Services,* 40 F.3d 1492, 1500 (7th Cir.1994), we must consider only the speech which caused the adverse action to be taken against the employee. *See Waters v. Churchill,* — U.S. —, —, 114 S.Ct. 1878, 1891, 128 L.Ed.2d 686 (1994) (plurality opinion of O'Connor, J.); *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Whether the speech is a matter of public concern is a matter of law which we may decide de novo. *Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1111, 130 L.Ed.2d 1076 (1995); *see Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7.

If Ms. Caruso's speech addressed a matter of public concern, it is protected if her interest in that expression outweighs the State's interest in promoting the efficiency of its public services. *Gregorich v. Lund,* 54 F.3d 410, 414 (7th Cir.1995) (citing *Waters,* — U.S. at —, 114 S.Ct. at 1884). We must independently balance these competing interests, just as the Supreme Court balanced the interests before it in *Connick. Connick,* 461 U.S. at 150 n. 10, 103 S.Ct. at 1692 n. 10 ("[W]e cannot 'avoid making an independent constitutional judgment on the facts of the case.'"); *see, e.g., Wright,* 40 F.3d at 1500; *see also Watters v. City of Philadelphia,* 55 F.3d 886, 895–97 (3d Cir. 1995); *Eiland v. City of Montgomery,* 797 F.2d 953, 956–60 (11th Cir.1986), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987). This balancing, while at times imprecise, *see Wright,* 40 F.3d at 1502, is "necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public func-

tions but simply because superiors disagree with the content of the employee's speech." *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *accord Watters,* 55 F.3d at 895. The Government bears the burden of justifying the discharge; *its burden varies depending on the nature of the employee's expression. Connick,* 461 U.S. at 150, 103 S.Ct. at 1691–92.

In order to determine if the government's interest in providing services efficiently outweighs the employee's First Amendment interests, we have noted that several factors should be taken into consideration:

(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among coworkers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Wright,* 40 F.3d at 1502; *see, e.g., Glass v. Dachel,* 2 F.3d 733, 742 (7th Cir.1993). The discussion in *Wright* is an elaboration of the Supreme Court's earlier explanation in *Rankin:*

[I]n weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention must be paid to the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails.

*Rankin,* 483 U.S. at 390, 107 S.Ct. at 2900.[3]

Furthermore, the government employer is entitled to consider the *"potential*

---

3. This formulation emphasizes the kinship of the *Connick–Pickering* analysis and the *Branti–Rutan* line of cases. Both deal, at bottom, with the

reconciliation of an employee's individual right of expression and the need of government to function effectively. As this court pointed out in

disruptiveness of the speech." *Waters,* —— U.S. at ——, 114 S.Ct. at 1890 (emphasis added). "The public employer is not required to wait until those working relationships actually disintegrate if immediate action might prevent such disintegration." *Breuer v. Hart,* 909 F.2d 1035, 1040 (7th Cir.1990); *see also Connick,* 461 U.S. at 152, 103 S.Ct. at 1692–93 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action. We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.").

## B.

■ Here, Ms. Caruso's speech clearly addressed a matter of public concern and thus satisfies the first step of the *Connick–Pickering* analysis. It involved the qualifications of the candidates for the position of Clerk and the times when the public ought to have access to that office. Ms. Caruso had a very strong interest in her expression; however, in the context of public employment, such expression, although important, must be balanced against the government's interest in the efficient provision of services to the public. We thus must decide whether such speech can be characterized as disruptive of the function of the Clerk's office. Upon examining the record before us according to the criteria set forth above, we must conclude that, even construing the evidence so as to resolve any ambiguity in the light most favorable to Ms. Caruso, Ms. De Luca did not infringe upon Ms. Caruso's First Amendment rights in deciding to replace her as the Deputy Clerk. Her deposition testimony reveals that, as a full-time Clerk, Ms. De Luca would be more involved in the daily management of the office. After the election, the office was to be reorganized and the Clerk was to become the full-time manager of the office. Fairly read, the deposition of Ms. De Luca, the successful candidate for the posi-

tion of Clerk, evidences management concerns if she and Ms. Caruso were to serve together in the small office. We believe that it was reasonable for Ms. De Luca to conclude, given the history of her relationship with Ms. Caruso, that it would not be a sound management decision for her to assume full-time direction of the office, a function formerly performed by Ms. Caruso, while having Ms. Caruso as "second in command." In making that judgment, Ms. De Luca was aware that Ms. Caruso had questioned, in her own bid to be Clerk, the earlier decision of Ms. De Luca with respect to the hours of the office. Ms. De Luca believed that Ms. Caruso's criticism had misrepresented the decision-making process that led to that decision. She evidenced concern as to whether, given Ms. Caruso's criticism of her earlier decisions, she could trust Ms. Caruso.[4] We hold that these legitimate management concerns with respect to the efficient operation of the Oakbrook Terrace Clerk's Office outweigh Ms. Caruso's First Amendment interests.

Accordingly, we believe that the record supports the district court's decision to grant summary judgment for the defendants. We therefore affirm the judgment of the district court.

AFFIRMED.

FLAUM, Circuit Judge, concurring in the judgment.

I fully agree with the court's decision that De Luca's failure to reappoint Caruso to the Deputy Clerk's position does not violate the First Amendment. With respect, I write separately because I believe our circuit precedent indicates that we analyze this situation under the *Elrod–Branti* political patronage line of cases, rather than under the *Connick–Pickering* line of cases.

As the majority appropriately notes, we have recognized that discharges based on political patronage or affiliation are best "characterized as a particular subset of the

---

*Heideman v. Wirsing,* 7 F.3d 659, 662 (7th Cir. 1993), the *Branti–Rutan* cases are but a "particular subset of the wider category of discharges based on the First Amendment."

**4.** *See supra* notes 1 & 2.

wider category of discharges based on the First Amendment." *Heideman v. Wirsing,* 7 F.3d 659, 662 (7th Cir.1993). Although the line between discharges based on political patronage and those based on employee speech is certainly not bright, the Supreme Court has developed different tests for these two situations, and our mode of analysis should depend "on the manner in which the exercise of an employee's First Amendment rights may impede the effective functioning of the public office in question." *Id.* We have therefore found that

> [b]oth *Elrod* and *Branti* embrace the notion that retaliation in response to political beliefs and political associations, which are typically manifested in the electoral process, may be warranted if the free expression poses a threat to the efficient conduct of a public office because the employee's position requires political loyalty. Because the individual and governmental interests are essentially unvarying in patronage cases, the focus is less on the expressive activity than on the office occupied by the person engaging in that activity. Accordingly, patronage based dismissals … are limited to persons holding policymaking positions.

*Id.* Thus, if an employee's political beliefs or affiliations potentially jeopardize the effective functioning of a public office because of the inherent characteristics of the employee's position, the political patronage cases provide the more appropriate analytical framework. *Id.; accord Rodriguez Rodriguez v. Munoz Munoz,* 808 F.2d 138, 144 (1st Cir.1986) (holding that *Elrod–Branti* standard should apply if political affiliation is legitimate requirement of employee's position).

In *Heideman,* the plaintiff was a deputy sheriff who supported another deputy in his unsuccessful election bid against the incumbent sheriff. The plaintiff was discharged as a result of a heated barroom argument in which he vigorously supported his candidate. After examining the two different methods of analysis, the *Heideman* court applied the political patronage caselaw to determine whether the plaintiff's discharge violated the First Amendment. *Heideman,* 7 F.3d at 662. Because Heideman had political beliefs that could have interfered with the efficiency of the sheriff's office and his performance as deputy sheriff, the majority analyzed the case under the *Elrod–Branti* framework. Judge Ripple, while concurring in the judgment, believed that Heideman's discharge for political speech necessitated a *Connick–Pickering* analysis. *Heideman,* 7 F.3d at 664–65 (Ripple, J., concurring).

I respectfully find the majority's attempts to distinguish the current case from *Heideman* unconvincing. Although Caruso did not run for office as the candidate of any political party, *Heideman* specifically noted that

> [t]he fact that [*Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991)] as well as this case involve the support of an individual candidate rather than party affiliation more broadly is of no consequence. In many counties, there is no real two-party system in local election contests. Competing candidates typically represent factions that owe only nominal allegiance to a political party. Voting is driven by factional rather than party adherence, as well as by the personalities of those competing for office.

*Id.* at 663, n. 4. Indeed, we have recently applied the *Elrod–Branti* analysis to a case where the discharged employee had no connection to a formal political party. *See Wallace v. Benware,* 67 F.3d 655 (7th Cir.1995) (examining circumstance in which discharged employee unsuccessfully ran against incumbent office holder). Caruso's actions appear no less political because they were not taken on behalf of a political party.

The majority also seeks to distinguish *Heideman* by relying on De Luca's testimony that she failed to rehire Caruso not because of political disloyalty but rather because De Luca lost confidence in the woman who would be her "second in command." De Luca's testimony, however, simply demonstrates her concern over a potential breakdown in the efficient operations of the City Clerk's office caused by Caruso's run for office. In fact, this characterization reflects a *common dispute in political patronage cases*—the plaintiff claims that she was discharged for political reasons and the defendant then justifies the discharge by asserting

that she lost confidence in the employee because of the employee's political activities. *See, e.g., Upton v. Thompson,* 930 F.2d at 1215–16 (holding sheriff justified in firing deputy who opposed his election because sheriff could not be confident deputy would support his policies); *Livas v. Petka,* 711 F.2d 798, 801 (7th Cir.1983) (holding prosecutor's losing confidence in assistant for political reasons was sufficient justification for dismissal). De Luca's loss of confidence and trust in Caruso can be directly traced to Caruso's political activities. In effect, Caruso ran on a political platform of "I would be a better City Clerk than De Luca." In light of this platform position, it is not surprising that De Luca believed that she could no longer have a productive working relationship with Caruso.

Since Caruso's bid for office could have endangered the efficient functioning of the City Clerk's office, due to the demands of Caruso's position as Deputy Clerk, I conclude that this case should be analyzed employing the political patronage caselaw. *See Rodriguez Rodriguez,* 808 F.2d at 144–45 (applying political patronage cases to discharge of employee who ran for office against candidate his supervisor supported). I completely agree with the majority's assessment that both the political patronage and the employee speech cases involve balancing an employee's right of expression against the need of government to function effectively. In the great majority of cases, the two analyses will undoubtedly yield identical results. However, because the employee and governmental interests in political patronage cases vary little from case to case, the crucial inquiry in political patronage cases invariably centers on the responsibilities of the discharged employee's position. *Heideman,* 7 F.3d at 662. Thus, the *Elrod–Branti* doctrine properly and efficiently focuses our inquiry on whether "political considerations are an appropriate requirement for the effective performance of the public office involved."[1] *Upton,* 930 F.2d at 1218 (quoting *Livas,* 711 F.2d at 800) (internal brackets omitted). Formulated differently, the test examines "whether the position held by the individual

authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." *Heideman,* 7 F.3d at 663 (quoting *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981)). In my judgment, as a result of Caruso's political activities, De Luca lost confidence in the willingness and ability of her "second in command" to effect her policies. For Caruso to function effectively as the Deputy Clerk, she needed to be able to work closely and productively with De Luca. Caruso's election campaign against De Luca made this an unlikely possibility. I therefore concur with the majority's decision that plaintiff's First Amendment claim cannot survive summary judgment.

---

1. Interestingly, the majority's own analysis primarily focuses on Caruso's role as Deputy Clerk and how her bid for office would undermine the efficient functioning of the City Clerk's office.