**Cynthia MYERS, Plaintiff,**

v.

**Karen HASARA and Gail Danner, Defendants.**

No. 97–3295.

United States District Court, C.D. Illinois, Springfield Division.

June 8, 1999.

James P. Baker, Springfield, IL, for plaintiff.

Robert M. Rogers, Springfield, IL, Bradley B. Wilson, Springfield, IL, for defendants.

## OPINION

RICHARD MILLS, District Judge.

The motion to dismiss was denied.

Discovery occurred.

Now, Defendants' motion for summary judgment must be allowed.

1. This position was a civil service position.

2. In both 1995 and 1996, the City received a grant from the Illinois Department of Public Health. Under the terms of this grant, the City agreed to establish food sanitation requirements which were consistent with those of the Illinois Department of Public Health. In addition, the City's health inspectors were

## I. BACKGROUND

Cynthia Myers worked for the City of Springfield, Illinois, from June 1986 until June 1997. Initially, Myers worked as an environmental health inspector in the City's department of public health, but she eventually was promoted to the position of health services supervisor[1]. As a health services supervisor, Myers oversaw the City's food inspection program, supervised five health inspectors, and personally conducted health inspections on such businesses as retail food stores, grocery stores, day care centers, mobile food stands, temporary food establishments, tanning facilities, and massage parlors operating within the City of Springfield. Myers' immediate supervisor was Steve Hall who in turn reported to Gail Danner, the City's department of public health's interim administrator. Gail Danner reported to Keith Haynes who was the director of the City's department of public affairs, and Haynes reported to the City's Mayor, Karen Hasara.

On March 13, 1995, Myers, in furtherance of her normal job duties, approved an application for an agricultural commodities license for Parsons' Produce ("Parsons' "). This license allowed Parsons' to sell fresh fruits and vegetables within the City of Springfield. Parsons' was a seasonal business which operated out of a large tent erected in the J.C. Penny's parking lot in Springfield. Shortly thereafter, Myers inspected Parsons' and completed a food inspection report which cited it for selling retail food items such as baked goods, jams, jellies, honey, and packaged vegetables in violation of the Illinois Retail Food Code[2]. Specifically, Myers was concerned that these food items were being exposed to the elements creating the risk of con-

required to enforce compliance with State health regulations as well as the City's health regulations. Although the City could not adopt health regulations which were less stringent than those promulgated by the Illinois Department of Public Health, it could adopt health regulations which were more stringent.

tamination from insects, rodents, molds, dust, and mildew because Parsons' was selling these retail food items from a tent. After conducting her inspection, Myers met with Hall, Danner, and Haynes to discuss her findings.

In early May 1995, Haynes, Danner, Hall, Myers, and Shirley Bohm, an employee of the Illinois Department of Public Health, conducted an on-site inspection of Parsons'. After conducting this inspection, Bohm advised Haynes that Parsons' was violating the State's health regulations. In a letter sent to Haynes dated May 11, 1995, Bohm expanded on her conclusion by explaining that Parsons' did not meet the definition of a temporary retail food store because it had operated at a fixed location for more than 14 days and that it did not qualify as a roadside market because it sold such pre-packaged products as jars of honey, jams, and jellies. Therefore, Bohm opined that Parsons' had to comply with all of the requirements of a retail food store and that Parsons' was not doing so.

In addition, after the inspection, Haynes asked for and received a memorandum from Springfield assistant corporation counsel Janis Von Qualon and a memorandum from Hall regarding Parsons'. In her memorandum dated May 22, 1995, Von Qualon advised Haynes that at least three reasons existed why abandonment of the State's health code and adoption of different regulations for vendors such as Parsons' was irrational. First, it would require a new code of regulations to be drafted. Second, the City's health inspectors would have to be educated regarding the changes and trained to enforce the new provisions. Third, and most importantly, the City would lose its state certification and the funding which accompanies it. Likewise, in his memorandum dated May 19, 1995, Hall informed Haynes that Parsons' did not meet the applicable State and City health regulations and suggested that Parsons' be limited to selling agricultural commodities consistent with its agricultural commodities license.

After receiving this information, Haynes informed Mayor Hasara that he was of the opinion that serious health code violations existed at Parsons'. Mayor Hasara then met with Mark Schmidt, who was the assistant director of the Illinois Department of Public Health, in order to obtain advice on how to proceed on the Parsons' issue. Although the City's department of public health continued to review issues surrounding Parsons' licensing, neither the Mayor's office nor the City's department of public health took any further action against Parsons' after May 1995, other than enforcing regulations regarding food handling and preparation. In October 1995, Parsons' closed for the season.

In March 1996, Parsons' again opened for business inside a tent located at the J.C. Penny's parking lot. Myers inspected Parsons', and on March 20, 1996, she wrote a memorandum to Danner in which she informed Danner that she could not approve Parsons' building permit because it did not meet the Illinois Department of Public Health's minimum requirements. In addition, Myers advised Danner that she was declining to either approve or disapprove Parsons' agricultural commodities license application because Parsons' met the definition of a retail food store, not an agricultural commodities facility. Myers opined that Parsons' should be required to apply for a retail food license, although she acknowledged that Parsons' would not qualify for such a license. In response, Danner informed Myers that she had previously approved Parsons' agricultural commodities license and that Myers did not need to take any further action regarding Parsons'[3]. Accordingly, Par-

---

**3.** Mayor Hasara and Danner assert that they gave Myers a clear directive that she was to have no further involvement with Parsons'. Myers denies that anyone at the Mayor's office or the City's department of public health ever gave her a directive to have no further involvement with Parsons'. In fact, Myers asserts that on April 1, 1996, she was as-

sons' continued to operate as it had in 1995 under an agricultural commodities license.

On May 23, 1996, Parsons' filed a second application for an agricultural commodities license to be used at a second facility operated at the White Oaks Mall's parking lot. That same day, Mayor Hasara, Haynes, and Danner met with Mark Schmidt and Dave King of the Illinois Department of Public Health to discuss Parsons'. At that meeting, Mark Schmidt guaranteed Mayor Hasara that the City would not lose its State funding if the City continued to allow Parsons' to operate as it had been under an agricultural commodities license. Moreover, Mark Schmidt and King advised Mayor Hasara, Haynes, and Danner that the Illinois Department of Public Health would not intervene in the Parsons' matter; rather, the Department would consider the issue to be a local concern.

Accordingly, Mayor Hasara, Haynes, and Danner decided that the City would not take any action against Parsons' regarding its ability to sell retail food products under its agricultural commodities license. On May 24, 1996, Mayor Hasara and Danner approved Parsons' application for an agricultural commodities license for its White Oaks Mall facility. Although the City allowed Parsons' to sell retail food products under an agricultural commodities license, Mayor Hasara instructed Haynes and Danner to ensure that Par-

sons' remedied all other existing code violations. Danner informed Myers and Hall that if any problems or issues arose regarding Parsons' which they felt uncomfortable handling, then she would address those problems herself and would keep them informed. Otherwise, Parsons' was going to continue to operate under the status quo.[4]

On May 30, 1996, while acting in her official capacity as a representative of the City's department of public health, Myers inspected the "Mandarin Express" which was a restaurant located at the White Oaks Mall.[5] While at the mall, Myers visited its manager, John Schmidt. During her conversation with John Schmidt, Myers asked him whether he had read the newspaper article regarding Parsons' Produce[6]. Schmidt acknowledged reading the article and began asking her questions about Parsons'.

The specifics of the conversation which ensued are somewhat disputed. Myers asserts that in response to Schmidt's questioning, she informed him that Parsons' did not meet the requirements for securing a retail food service license, that Parsons' possessed an agricultural commodities license, that Parsons' was in conflict with the applicable health regulations, and that the City was not going to take any action against Parsons'. Myers claims that in response to a comment by Schmidt

signed to investigate a complaint issued against Parsons'. Mayor Hasara and Danner, in turn, deny that Myers was assigned to investigate a complaint against Parsons' on April 1, 1996.

4. Myers claims that after completing her March 1996 report, she had little involvement with Parsons'. She asserts that she did not in any way attempt to interfere or obstruct Parsons' business activities. However, Mayor Hasara and Danner claim that they continued to receive reports and complaints that Myers was "hanging around" and harassing Parsons'.

5. Myers asserts that it was commonplace for the City's health inspectors to have discus-

sions with the mall's management regarding the status of food purveyors operating within the mall and to make them aware of any complaints against and/or health violations by vendors operating at the mall. Mayor Hasara and Danner deny that such conversations were commonplace because it was the City's policy that information concerning individuals or businesses served by the City's department of public health was confidential and was not to be disclosed without a formal request being filed pursuant to the Freedom of Information Act.

6. The May 24, 1996, edition of the "State–Journal Register" contained an article regarding Parsons' compliance with the City's and State's health regulations.

regarding potential liability if a consumer were to sue Parsons', she informed him that, from her experience, a property owner is usually included in such a lawsuit. Myers argues that at all times during her conversation with Schmidt, she was merely attempting to truthfully answer his questions and was relaying the City's official policy regarding Parsons'.

Mayor Hasara and Danner assert that Myers told Schmidt that Parsons' was not in compliance with the applicable health regulations because it did not have a retail food service license. Furthermore, Mayor Hasara and Danner claim that Myers told Schmidt that the regulations at issue were not going to be changed and that the mall would be held liable if anyone were injured as a result of buying retail food items from Parsons'. Mayor Hasara and Danner argue that Myers' comments to Schmidt were in direct conflict with the City's official position regarding Parsons'.

Schmidt informed Myers that based upon their conversation, he was going to take action against Parsons' because it was the mall owner's policy that all tenants were to comply with all federal, state, and local laws in order to keep their lease.

On May 31, 1996, Brian McFadden, Mayor Hasara's chief of staff, received a letter from Jeff Parsons, the owner of Parsons' Produce. The letter provided:

> It has been brought to my attention by White Oaks General Manager, Mr. David Faulkner that Cindy Myers from City Health department made a visit to mall office on May 30, 1996. Miss Myers stated to mall management that Parsons Produce was operating on mall property without a City Health permit and that White Oaks Mall would be held responsible for any problems that may occur. Frankly I'm very upset that this City Health inspector would go to such lengths trying to intimidate myself and the people we do business with. We run

a clean, respectable business and would like to continue operating in Springfield.

After receiving this letter and becoming aware that Myers spoke to John Schmidt about Parsons', Mayor Hasara wanted Myers terminated because she believed that Myers' comments would interfere with the running of the City's department of public health and because she believed that the comments resulted in confusion and frustration on the part of the mall's management as to how to deal with Parsons'. Although Haynes agreed that Myers should be disciplined, he believed that anything more than a few days suspension would be too severe given Myers' work record.

On June 13, 1996, Myers was given a pre-disciplinary hearing[7]. On June 21, 1996, Myers was suspended for five days. Her written notice of suspension indicated that the reason for her suspension was for violating civil service rule 48(e): failure to obey a reasonable directive. Myers' comments to John Schmidt formed the sole basis for her suspension. Accordingly, Myers has filed the instant suit against Mayor Hasara and Gail Danner alleging that her suspension violated her First Amendment right to free speech and her rights under 42 U.S.C. § 1983.

## II. STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. 56(c); *see Ruiz–Rivera v. Moyer*, 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex*

---

**7.** Civil service employees who receive a suspension of more than five calendar days must be granted a hearing before the civil service commission. 65 ILCS 5/10–1–18.

*Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987).

## III. ANALYSIS

In November 1997, Defendants filed a motion to dismiss Plaintiff's Complaint arguing that she had failed to state a cause of action upon which relief could be granted. Fed.R.Civ.Pro. 12(b)(6). Specifically, Defendants asserted: (1) that Plaintiff was not speaking on an issue of public concern, (2) that the City's interest as employer in promoting efficient and effective public service outweighed Plaintiff's right to express herself, and (3) that they were protected from liability in this suit by the doctrine of qualified immunity. The Court's initial reaction to Defendants's motion was that it should be allowed.

Neverthless, the Court denied Defendants' motion, in part, based upon *Gustafson v. Jones,* 117 F.3d 1015, 1019 (7th Cir.1997), wherein the United States Court of Appeals for the Seventh Circuit stated:

it would be a rare case indeed where the pleadings as a whole would permit judgment as a matter of law on this point, unless the plaintiff was relying on

speech that is wholly unprotected by the First Amendment or the defendant's justifications were frivolous. Normally, application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery.

*Id.*

The parties have now conducted discovery, and Defendants have moved for summary judgment. Defendants argue that the facts revealed during discovery establish that they are entitled to summary judgment for the same three reasons which they raised in their motion to dismiss. Plaintiff argues that the facts revealed during discovery establish that she was speaking on an issue of public concern, that her right to free speech outweighed Defendants' interests, and that Defendants are not immune from liability based upon the doctrine of qualified immunity. At a minimum, Plaintiff claims that a genuine issue of material fact exists which precludes the Court from entering summary judgment against her.

Having come full circle, the Court will now allow Defendants' motion for summary judgment.

### A. *PUBLIC CONCERN*

■ To determine whether an individual's First Amendment right to free speech has been infringed upon, the Court must invoke the *Pickering* balancing test. *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Illinois,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This test is applied on a case-by-case basis. *Id.* at 569, 88 S.Ct. 1731. Essentially, the *Pickering* balancing test establishes that "a public employee's speech is constitutionally protected if it would be protected if uttered by a private citizen, it relates to a matter of public concern, and the public employer has not shown a convincing reason for forbidding the speech."[8]

---

**8.** The Seventh Circuit has also described the *Pickering* balancing test as follows: in order

for speech "to be protected by the First Amendment, (1) the speech by a governmen-

*Hulbert v. Wilhelm,* 120 F.3d 648, 650 (7th Cir.1997); *Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Brown v. Disciplinary Comm. of Edgerton Volunteer Fire Dep't,* 97 F.3d 969, 972 (7th Cir.1996); *Dishnow v. Sch. Dist. of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996).

■ The factors which the Court must consider when determining whether a public employee's statements address a matter of public concern is the statement's content, form, and context, with the statement's content being the most important factor. *Khuans v. Sch. Dist. 110,* 123 F.3d 1010, 1014–15 (7th Cir.1997); *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Smith v. Fruin,* 28 F.3d 646, 651 (7th Cir.1994). In *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the United States Supreme Court stressed the importance of the requirement that a public employee's speech involve a matter of public concern:

> The repeated emphasis in *Pickering* on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language ... reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter.

> \* \* \* \* \* \*

■ [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

tal employee must be on a matter of public concern, and (2) the employee's interest in expressing herself on the matter must not be outweighed by any injury the speech could

*Id.* at 147, 103 S.Ct. 1684. Thus, speech on a matter of public concern is "speech relating to any matter of political, social, or other concern to the community." *Khuans,* 123 F.3d at 1014–15; *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. In short, the Court must determine whether Plaintiff was speaking "more like a citizen or a disgruntled employee whose statements are primarily of personal interest." *Colburn v. Trustees of Indiana Univ.,* 973 F.2d 581, 585 (7th Cir.1992).

■ Plaintiff argues that her speech is protected by the First Amendment because she spoke out as a private citizen regarding a matter which concerned the public's health and safety. Specifically, Plaintiff asserts that her speech was a result of her fear that a member of the public would be harmed based upon Parsons' failure to comply with the State's and City's health regulations.

However, the Court believes that when Plaintiff had her conversation with John Schmidt, she spoke more as a disgruntled employee than as a private citizen and that her speech did not address a matter of public concern. Therefore, the Court finds that Plaintiff's speech is not entitled to protection under the First Amendment.

■ In making this determination, the Court is cognizant of the fact that speech does not have to be broadcast to the world in order to receive the First Amendment's protection. *Givhan v. W. Line Consol. Sch. Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The Court is also aware that while Plaintiff's motive for the speech is a relevant factor to consider, it is not the dispositive consideration. *Gregorich v. Lund,* 54 F.3d 410, 415 (7th Cir.1995); *Cliff v. Bd. of Sch. Comm'rs of the City of Indianapolis, Indiana,* 42 F.3d 403, 409 (7th Cir.1994). Simply because a public employee has a

cause to the interest of the state, as employer, in promoting efficient and effective public service." *Khuans v. Sch. Dist. 110,* 123 F.3d 1010, 1014 (7th Cir.1997).

personal interest in the speech does not *ipso facto* mean that his remarks constitute a matter of private, rather than public, concern. *Fruin,* 28 F.3d at 653. "Many public employees who speak out about conduct within their places of employment have some interest in the institution of change, and this by itself would not prevent their speech from being constitutionally protected." *Colburn,* 973 F.2d at 587; *Breuer v. Hart,* 909 F.2d 1035, 1039 (7th Cir.1990).

Although one could draw the inference that Plaintiff was concerned about the public's health and safety when she spoke to John Schmidt, her exact language is directed specifically at Parsons'. According to her statement of undisputed facts, Plaintiff advised Schmidt that Parsons' had an agricultural license, that it could not meet the qualifications for a retail sales license, that it was in violation of certain health regulations, and that the City planned to take no action against it to rectify those violations. At no time did Plaintiff represent to Schmidt that Parsons' violations jeopardized the public's health, safety, or well-being. On the contrary, the content of Plaintiff's speech centered upon Parsons' licensing, its compliance with the health code, the City's response, and the impact upon the mall.

Likewise, the context and form of Plaintiff's speech indicate that she was not speaking as a private citizen. First, "[i]n speaking on this issue, [Plaintiff] did not act simply as a member of the general public; it was h[er] *job* to investigate such violations and make recommendations as to the appropriate response." *Marquez v. Turnock,* 967 F.2d 1175, 1178 (7th Cir. 1992). Second, Plaintiff was not speaking in a public forum or to a general audience; rather, her conversation was limited to one person. *See Wales v. Bd. of Educ. of Community Unit Sch. Dist. 300,* 120 F.3d 82, 84 (7th Cir.1997) (holding that "[a]lthough the first amendment is not limited to speech that is broadcast to the world . . . an employee's decision to deliver the

message in private supports an inference that the real concern is the employment relation . . . ." (citations omitted)).

Third, Plaintiff steered her conversation to the issue of Parsons' licensing (or at least raised the issue), indicating her desire to make her personal opinions, rather than the City's official policy, known to Schmidt. Finally, although Myers denies that her conversation was the result of any personal animus towards Parsons' or the City's policy regarding it, John Schmidt testified that it appeared to him that Myers' statements regarding Parsons' was a result of her frustration regarding the City's policy allowing it to operate under an agricultural commodities license. *See Button v. Kibby–Brown,* 146 F.3d 526, 529 (7th Cir.1998) (holding that although the speaker's motive is not dispositive, it is a relevant factor); *see also Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir.1994) (same).

Although none of these factors are individually determinative, the Court believes that the content, form, and context of Plaintiff's conversation with John Schmidt establish that her speech did not address a matter of public concern and, therefore, does not deserve First Amendment protection.

### B. *BALANCING OF INTERESTS*

■ Even if the Court were to characterize Plaintiff's speech as being the result of her concern for the public's health and safety, Defendants would still be entitled to summary judgment because their interest as a public employer in promoting efficient and effective public service outweighed Plaintiff's right to express herself on the Parsons' matter. *Khuans,* 123 F.3d at 1014. All courts have recognized that the weighing of an individual's interest in free speech against the government's interest in efficient and effective public service is a difficult task. *Connick,* 461 U.S. at 150, 103 S.Ct. 1684. However, this balancing "is necessary to ensure that public employers do not use authority over em-

ployees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). The Seventh Circuit has held that

> [t]o determine whether the government's interest in providing services efficiently outweighs the employee's free speech rights, [a court should] consider: (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Khuans,* 123 F.3d at 1015; *Caruso v. De Luca,* 81 F.3d 666, 670 (7th Cir.1996); *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1502 (7th Cir.1994).

### 1. *Harmony in the workplace*

Plaintiff argues that her speech did not create problems within the City's department of public health. In addition, Plaintiff asserts that her speech did not cause any confusion in the mall's management or the general public. Plaintiff claims that she merely relayed the City's official policy to John Schmidt.

However, Plaintiff's assertions are belied by the evidence. First, her speech caused division within the City's hierarchy as to how to properly address Plaintiff's actions. Mayor Hasara wanted Plaintiff terminated; Haynes believed that a few days suspension would be appropriate; Hall believed that no adverse employment action should be taken against Plaintiff. Thus, it is clear that, contrary to Plaintiff's claim, her speech did cause problems and division within the City's department of public health.

Second, while there may be a dispute as to whether Plaintiff's speech caused confusion within the mall's management, it is clear that her speech caused confusion with Parsons'. This confusion is evidenced by the letter which its owner, Jeff Parsons, faxed to the Mayor's office. Therein, Jeff Parsons complained directly of Plaintiff's conversation with John Schmidt. Although Plaintiff denies that she advised John Schmidt that the mall would be held responsible for any problems stemming from Parsons' failure to be properly licensed, Jeff Parsons' letter indicates, correctly or incorrectly, that that is what he believed Plaintiff told Schmidt. As such, Jeff Parsons was obviously confused regarding his business' status in Springfield.

Finally, although Plaintiff denies that she was ever given a directive to abstain from any further involvement with Parsons' and asserts that a genuine issue of material fact exits on that issue, this dispute does not preclude the Court from entering summary judgment in Defendants' favor. Whether Plaintiff was given a directive to remain silent regarding the Parsons' issue and whether she violated that directive are irrelevant to this Court; that issue was the one before the civil service commission.

This Court's inquiry is limited to whether Defendants' interest as a public employer in promoting efficient and effective public service outweighed Plaintiff's right to express herself. In making this determination, the United States Supreme Court has held that "the district court should look to the facts as reasonably found by the employer." *Weicherding v. Riegel,* 160 F.3d 1139, 1142 (7th Cir.1998), citing, *Waters,* 511 U.S. at 675–77, 114 S.Ct. 1878. Plaintiff has admitted that Mayor Hasara believed that Myers' comments would interfere with the running of the City's de-

partment of public health. In addition, whether or not she ever received such a directive, Plaintiff admits that Mayor Hasara gave a directive to Haynes that she was to have no further role related to Parsons'. At a minimum, Plaintiff knew that, contrary to her recommendations, Defendants had approved Parsons' license and were not going to take any action against it for its violation of the health codes. Nevertheless, Myers initiated a conversation with the mall's management regarding Parsons', creating problems within the department and confusing Jeff Parsons.

### 2. *Personal loyalty and confidence*

Plaintiff's employment relationship with the City's department of public health necessitated loyalty and confidence. Although information regarding a business' compliance with applicable health codes could be obtained, it could only be obtained through a formal request pursuant to the Freedom of Information Act. Moreover, employees within the City's department of public health (including Plaintiff) were required to sign an acknowledgment of the City's confidentiality policy which recognized and maintained the privacy interests of the businesses which the department investigated. Thus, the City relied upon its employees to maintain the privacy and confidentiality of the businesses which it served.

### 3. *Time, place, manner, & context*

As explained above, the time, place, manner, and context of Plaintiff's speech weighs in favor of Defendants' interests. Plaintiff visited John Schmidt, at least in part, to initiate a conversation with him regarding Parsons' and to make him aware of the controversy surrounding it. Her audience was limited and did not have the authority to change the City's policy, only to render economic harm to Parsons'. *Wales,* 120 F.3d at 84. Moreover, John Schmidt believed that Plaintiff's comments regarding Parsons' were rendered as a

result of her frustration with the City's inaction toward Parsons' licensing violations. *Colburn,* 973 F.2d at 585. As such, the Court finds that the time, place, manner, and context of Plaintiff's speech weighs in favor of Defendants' interests.

### 5. *Necessity of debate*

Contrary to Plaintiff's claims, she was given an opportunity to express her views on the Parsons' issue. In fact, Plaintiff wrote a report in March 1995 expressing her view that Parsons' was not complying with its agricultural commodities license. After writing this report, Plaintiff met with her supervisors to discuss her findings and concerns. Again in March 1996, Myers inspected Parsons' and wrote a memorandum to Danner in which she informed Danner that she could not approve Parsons' building permit and that she was declining to either approve or disapprove Parsons' agricultural commodities license application. Nevertheless, the City adopted a policy which allowed Parsons' to operate under an agricultural commodities license.

However, simply because the City adopted a policy contrary to Plaintiff's recommendations does not mean that she was denied an opportunity to provide input on the debate. In fact, much debate surrounded the Parsons' licensing issue. The Mayor and the City's department of health sought advice from the City's corporate counsel and the State Department of Public Health before reaching its decision. As the Seventh Circuit has noted:

> Vigorous debates within the agency, even at the eleventh-hour, are to be expected, but at a certain point the department's position must be set firmly if the department is to function. Agency decisionmakers may then punish thirteenth-hour efforts to undermine their authority and disrupt the functioning of their offices by subordinates seeking to undercut final decisions with which they disagree.

*Wright*, 40 F.3d at 1504. Thus, the Court believes that this factor weighs in Defendants' favor.

### 6. *Role of the speaker*

Finally, as noted above, Plaintiff was speaking more as a City employee than as a private citizen during her conversation with John Schmidt. She was at the mall's office while on official business and in furtherance of her job duties. "In speaking on this issue, [Plaintiff] did not act simply as a member of the general public; it was h[er] *job* to investigate such violations and make recommendations as to the appropriate response." *Marquez*, 967 F.2d at 1178; *C.f., Egger v. Phillips*, 710 F.2d 292, 324 (7th Cir.1983) (en banc). Accordingly, the Court finds that Defendants' interest as employer, in promoting efficient and effective public service outweighed Plaintiff's interest in expressing herself on the Parsons' matter.

### C. *QUALIFIED IMMUNITY*

■ Finally, even if the Court were to find that Defendants violated Plaintiff's First Amendment rights, they would still be protected from liability in this suit based upon the doctrine of qualified immunity. Qualified immunity shields government officials who are performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether a defendant will be protected by qualified immunity "turns on the 'objective legal reasonableness' of the action, *Harlow*, 457 U.S., at 819, 102 S.Ct. 2727, assessed in light of the legal rules that were 'clearly established' at the time it was taken, *id.*, at 818, 102 S.Ct. 2727." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). As the United States Supreme Court stated in *Anderson:*

The contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ...; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. 3034 (citations omitted).

However, it is not necessary for a plaintiff to produce a prior case that is on "all fours" with the case at hand. *Gregorich*, 54 F.3d at 415; *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir.1996). Accordingly, in deciding whether an official is protected by qualified immunity, the district court must determine: " '(1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question?' " *Hill v. Shelander*, 992 F.2d 714, 717 (7th Cir.1993) quoting *Rakovich v. Wade*, 850 F.2d 1180, 1210 (7th Cir.1988); *Burns v. Reed*, 44 F.3d 524, 526–27 (7th Cir.1995).

■ In the instant case, after applying the *Pickering* balancing test, the Court has concluded that Defendants' conduct did not constitute a violation of Plaintiff's First Amendment right to free speech. Therefore, Defendants are entitled to qualified immunity. *Id.*

As for the second prong, while it is clear that a public employer may not retaliate against an employee for exercising his First Amendment speech rights, the Court believes that Defendants' conduct fell into a wide gray area which requires the Court to give them the benefit of the doubt on the issue of qualified immunity. *Gustafson*, 117 F.3d at 1021; *Walsh v. Ward*, 991 F.2d 1344, 1346 (7th Cir.1993). Defendants suspended Plaintiff not so much for what she said but because they believed that she had disobeyed a directive in violation of civil service rule 48(e). As such, Defendants responded as an employer seeking to maintain order within the City's

department of public health rather than in retaliation for Plaintiff exercising of her right to free speech.

Accordingly, the Court finds that there are no genuine issues of material fact to be decided by the trier of fact and that Mayor Hasara and Danner are entitled to judgment as a matter of law.

*Ergo,* Defendants' Motion for Summary Judgment is ALLOWED. Pursuant to Federal Rule of Civil Procedure 56, summary judgment is hereby entered in favor of Defendants and against Plaintiff as to both Counts of Plaintiff's Complaint.